STATE OF NORTH DAKOTA

COUNTY OF CASS

IN DISTRICT COURT

EAST CENTRAL JUDICIAL DISTRICT

| | |
|---|---|
| Ben Woodside and Ray Kvalvog,<br><br>               Plaintiffs,<br><br>v.<br><br>Tri State Solutions, LLC, a Delaware limited liability company; Rah Rah Solutions, LLC, a Delaware limited liability company; David Nelson; Great Point Capital, LLC, a Delaware limited liability company; Brady Thomas Lipp; and Joseph Jackson Ransdell,<br><br>               Defendants. | Case No. _____<br><br><br>**SUMMONS** |

TO THE ABOVE-NAMED DEFENDANT, GREAT POINT CAPITAL, LLC, C/O CORPORATION SERVICE COMPANY, 251 LITTLE FALLS DRIVE, WILMINGTON, DE 19808:

[1]     You are hereby summoned and required to appear and defend against the

Complaint in this action, which is hereby served upon you, by serving upon the undersigned an

answer or other proper response within twenty-one (21) days after the service of this Summons

upon you, exclusive of the day of service.

[2]     If you fail to do so, judgment by default will be taken against you for the relief

demanded in the Complaint.

Dated: December 19, 2025

*/s/ Michael Raum*
Michael S. Raum #05676
Todd E. Zimmerman #05459
Abigale R. Griffin #09044
**FREDRIKSON & BYRON, P.A.**
51 Broadway, Suite 400
Fargo, ND 58102
Telephone: (701) 237-8200
mraum@fredlaw.com
tzimmerman@fredlaw.com
agriffin@fredlaw.com

Sandra S. Smalley-Fleming (pro hac vice forthcoming)
Ryan C. Young (pro hac vice forthcoming)
60 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 492-7000
ssmalleyfleming@fredlaw.com
ryoung@fredlaw.com

Attorney for Plaintiffs

STATE OF NORTH DAKOTA

COUNTY OF CASS

IN DISTRICT COURT

EAST CENTRAL JUDICIAL DISTRICT

| | |
|---|---|
| Ben Woodside and Ray Kvalvog,<br><br>Plaintiff,<br><br>v.<br><br>Tri State Solutions, LLC, a Delaware limited liability company; Rah Rah Solutions, LLC, a Delaware limited liability company; David Nelson; Great Point Capital, LLC, a Delaware limited liability company; Brady Thomas Lipp; and Joseph Jackson Ransdell.<br><br>Defendants. | Case No. _____<br><br><br>**COMPLAINT** |

[1]     Plaintiffs Ben Woodside and Ray Kvalvog, for their Complaint against Tri State Solutions, LLC, a Delaware limited liability company; Rah Rah Solutions, LLC, a Delaware limited liability company; David Nelson; Great Point Capital, LLC, a Delaware limited liability company; Brady Thomas Lipp, and Joseph Jackson Ransdell ("Defendants"), state and allege as follows:

**Parties**

[2]     Plaintiff Ben Woodside is an individual resident in West Fargo, North Dakota.

[3]     Plaintiff Ray Kvalvog is an individual resident in Moorhead, Minnesota.

[4]      Defendant Tri State Solutions, LLC ("Tri State") is a Delaware limited liability company with its principal place of business in Minnesota.

[5]      Defendant Rah Rah Solutions, LLC ("Rah Rah") is a Delaware limited liability company with its principal place of business in Minnesota.

[6]     David Nelson ("Nelson") is an individual resident in Minnesota.

[7]     Nelson is an owner and principal of Tri State and Rah Rah.

[8]     Defendant Great Point Capital, LLC ("Great Point") is a Delaware limited liability company with its principal place of business in Illinois.

[9]     Great Point is a broker dealer which is registered with the Securities and Exchange Commission. Great Point is regulated by the Financial Industry Regulatory Authority ("FINRA") and is subject to its rules and regulations.

[10]     Great Point is registered as a foreign limited liability company with the North Dakota Secretary of State in North Dakota, and is registered as a broker-dealer with the North Dakota Securities Commissioner.

[11]     Brady Thomas Lipp ("Lipp") is an individual resident in Minnesota.

[12]     Lipp is registered with FINRA as a broker and is subject to its rules and regulations.

[13]     At the times of the events described herein, Lipp was employed by Great Point, which was responsible for overseeing his brokerage activities pursuant to FINRA rules and regulations.

[14]     At the times of the events described herein, Lipp was not registered as broker with the North Dakota Securities Commissioner.

[15]     Joseph Jackson Ransdell ("Ransdell") is an individual who is, on information and belief, a resident in Illinois.

[16]     Ransdell is registered with FINRA as a broker and is subject to its rules and regulations.

[17]    At the times of the events described herein, Ransdell was employed by Great Point, which was responsible for overseeing his brokerage activities pursuant to FINRA rules and regulations.

[18]    At the times of the events described herein, Ransdell was not registered as broker with the North Dakota Securities Commissioner.

### The Initial Solicitation

[19]    In 2023, Woodside received a phone call from Lipp.

[20]    At the time of the call, Lipp knew that Woodside and Kvalvog were entrepreneurs who invested together in business opportunities.

[21]    Lipp explained that Rah Rah Solutions was a company aimed at helping youth sports do fundraising. He stated that Rah Rah needed investors and investment dollars to finalize the mobile app that was the basis of, and critical to, its business model. He told Woodside he thought of him and Kvalvog because he knew they had other businesses and had capital.

[22]    He explained that David Nelson was the founder and CEO of Rah Rah and urged Woodside and Kvalvog to meet with Lipp and Nelson to hear a pitch for an investment.

[23]    Woodside agreed that he would meet with Nelson and Lipp. The initial meeting took place on or about September 13, 2023, at the Tavern Bar and Grill in West Fargo, North Dakota. Because of his schedule, Kvalvog was not able to attend the meeting. The meeting lasted over an hour. After basic pleasantries and introductions, the meeting focused on the business of Rah Rah, with both Lipp and Nelson actively encouraging Woodside (and Kvalvog) to invest.

### Nelson and Rah Rah's Statements at the Tavern Meeting

[24]    At the meeting, Nelson made various factual statements about Rah Rah and the opportunity to invest.

[25]    Nelson stated that the primary need for capital at Rah Rah was to finish development of the Rah Rah mobile app, which would be the platform on which users accessed the product. He discussed the features of the final Rah Rah app, how the app platform would be used, and how it would be used for youth fundraising.

[26]    Nelson said that the app was under development with a third-party software developer, and that the investment from Woodside and Kvalvog would be used to pay for the development to be completed.

[27]    Nelson claimed that Rah Rah already had customers. He said Rah Rah currently had over fifteen Minnesota high schools ready and committed to use Rah Rah. He also stated that there were ten major youth hockey organizations that were on board with Rah Rah, representing approximately 10,000 youth hockey players who were going to use the Rah Rah app as their fundraising platform. He identified the 8-10 different hockey districts that comprised the 10,000 youth hockey players.

[28]    Nelson further claimed that five or more Junior Olympic youth volleyball organizations were excited and committed to use Rah Rah.

[29]    Nelson explained that his good friend Nate McKinley, who lived in Chicago, had fifteen or more schools in Chicago to use Rah Rah. He stated that McKinley already worked with these schools on a different fundraising platform, but that they were ready to switch when Rah Rah's app was finalized.

[30]    Nelson also described other forms of revenue streams that he was developing, all of which would run through the Rah Rah app.

[31]    In sum, Nelson conveyed to Woodside that Rah Rah already had numerous customers lined up and the only thing preventing Rah Rah from being fully operational was the completion of its app, which is what the investment money from Woodside and Kvalvog would be used to do.

### Lipp and Great Point's Statements at the Tavern Meeting

[32]    Lipp was a full and active participant at the meeting, repeatedly urging Woodside to invest in what he called a "guaranteed win."

[33]    Lipp reiterated how impressed he was with Dave Nelson and the development of Rah Rah.

[34]    On information and belief, Lipp presented the opportunity to sell Rah Rah to Great Point before approaching Plaintiffs.

[35]    On information and belief, Lipp, Ransdell, and other employees of Great Point conducted multiple due diligence phone calls with Nelson to investigate its possible involvement.

[36]    Lipp explained that he was working for Great Point Capital, through whom he had his securities license. He emphasized his role as a licensed broker, discussing the ethical duties he has as a licensed broker.

[37]    He discussed the time commitment it took him to get approval from Great Point in order to work on getting investors for Rah Rah. He discussed the research and work that both he and Great Point did on Rah Rah that made this investment possible and what he called a "can't lose" deal.

[38]    Lipp also reviewed the extensive work he and Great Point did to assist in the valuation of Rah Rah, including what he called a "competitor analysis." He further explained that he and Great Point had assisted Rah Rah with its executive summary, pro forma, and financial projections.

[39]    He made it clear that he and Great Point had brought down the valuation of Rah Rah so that it would be more appealing to investors and investors would get more shares in the company, which would give investors better opportunities for higher returns. He emphasized that as being part of the best aspects of the deal for Woodside and Kvalvog.

[40]    Lipp stated that he and Great Point had created the opportunity and the significant return that Woodside and Kvalvog would get from investing in Rah Rah. He described it as the best deal he and Great Point had done and reiterated that there was "no way" Woodside and Kvalvog could lose on this deal.

[41]    He emphasized that Great Point had tremendous backing and an incredible network that if needed would help in securing additional capital for Rah Rah.

[42]    Finally, he stated that this was such a great investment that he personally wanted to be part of Rah Rah and to invest in Rah Rah.

### Follow-Up Written Communications

[43]    In advance of the meeting at the Tavern, Nelson had sent Woodside an email, on which he copied Lipp at his Great Point email address, transmitting an "Executive Summary" relating to Rah Rah. A copy of the email is attached as <u>Exhibit A</u> and a copy of the Executive Summary is attached as <u>Exhibit B.</u>

[44]    Woodside did not have a chance to review the Executive Summary before the meeting, but Nelson brought a printed copy of it and made reference to it throughout the

meeting. The Executive Summary described the business of Rah Rah and contained clickable links to a pitch deck.

[45]    Following the meeting, Nelson sent a follow-up email to Woodside and again copied Lipp at his Great Point email address. In that email, he re-attached the Executive Summary which he had printed out and brought to the meeting. A copy of the email is attached as Exhibit C.

[46]    The Executive Summary claimed the following about Rah Rah:

### Intellectual Property

RahRah has a registered trademark and has applied for a provisional patent .

[47]    On information and belief, based on a search of public records, no application for a provisional patent has been submitted on behalf of Rah Rah or Tri-State.

[48]    The Executive Summary confirmed that the key to Rah Rah's success was the app. It identified (at 9) that funding would be used to create that "improved product."

### Financing Needed

In order for RahRah to scale and grow into other markets, funding will be a vital part of our growth to accelerate. Creating a new and improved product and have an outside sales force into our communities.

We are looking to raise 2million in equity.

[49]    The Executive Summary described this app (at 11) as "RahRah 2.0."

**Technology**

RahRah will be able to use digital devices for all sales reps to perform duties for signing agreements, onboarding and communication. We will not have to rely on print for our sales force. Email marketing, CRM platforms for our sales reps will be accessible tools.

We use JustiFi for payment processing a local Minneapolis company, AWS, Quickbooks, Heroku, Flutter, Digital Ocean.

Rebuilding our front and back end systems, combined with our mobile application through a relaunch of the product in Fall 2024 with RahRah 2.0.

[50]    The schedule for development as identified (at 17) as being in time for the fall

2024 sports season.

2022 was designed to start development of the new sales platform with re-design and new features that will provide the participants with a better system and solution to promote supporters to join RahRah! The new platform will be completed and launched for new sales distribution with schools for the fall 2024 selling season.

[51]    The Executive Summary emphasized the role of Great Point Capital and Brady

Lipp. For example, pages 17-18 of the Executive Summary identified various advisors to Rah

Rah. One identified advisor was "Brady Lipp, Great Point Capital." Page 29 of the Executive

Summary described the role of Great Point and Brady Lipp in relation to Rah Rah:

**Investor Agreement – Great Point Capital**

Great Point Capital Investor Engagement Agreement

For over twenty years, Great Point Capital has been providing independent, holistic wealth management, investment banking and capital market services. Founded and staffed by professional traders, bankers and experienced wealth managers. Great Point delivers the unique combination of local, customized services with a national brand and deep resources.

RahRah is working with Brady Lipp an investment banker from Great Point Capital who lives in Minneapolis. Brady has connected David Nelson, RahRah's Founder/CEO with individuals who are interested in investment opportunities with RahRah.

[52]    The Great Point Engagement Agreement was available by clicking the link. A copy of that agreement is attached as <u>Exhibit D</u>.

[53]    The Engagement Agreement was signed by Ransdell, identified as the "Director of Private Equity," on behalf of Great Point.

[54]    The Engagement Agreement called for Rah Rah to pay Great Point an up-front fee of $15,000 and an additional fee of 9% of any amounts invested as a result of Great Point.

[55]    Woodside provided the materials to Kvalvog, who reviewed them before investing.

### The Investment

[56]    Following the meeting, but before the investment, Woodside received a phone call from Ransdell. Ransdell explained that he was the head of private securities at Great Point, and that he was partnered with Lipp on the Rah Rah investment. Ransdell explained how he and Lipp had been working on researching the investment and what a great opportunity Rah Rah presented.

[57]    In November 2023, Woodside and Kvalvog each invested $500,000.00 in Rah Rah. In exchange each received an 11.9% interest in Rah Rah (the "<u>Rah Rah Units</u>"). A copy of the Subscription Agreement for Woodside is attached as <u>Exhibit E</u> and a copy of the Subscription Agreement for Kvalvog is attached as <u>Exhibit F.</u>

[58]    Woodside and Kvalvog each executed an Operating Agreement for Rah Rah. A copy of the Operating Agreement for Woodside is attached as <u>Exhibit G.</u>

### Post-Sale Fee Seeking by Lipp and Ransdell for Great Point

[59]    Immediately following the sale, in the first two weeks of November, 2023, Plaintiffs were contacted by a law firm with which they were unfamiliar seeking to receive the funds for the Rah Rah investment. The email provided:

> **Gregory Jordan**
> gjordan@jz-llc.com
>
> I have attached the escrow agreement for the investment in RahRah Solutions, LLC. David Nelson will lodge the membership units in RahRah Solutions, LLC with our firm and Bon Woodside will deliver the investment funds to the escrow account our firm established. Once we have both the funds and membership units, we will distribute accordingly.
>
> Gregory J. Jordan
> Licensed in Illinois and Indiana
> Jordan & Zito LLC
> 350 North LaSalle Street, Suite 1100
> Chicago Illinois 60654
> (312) 854-7181 (Office)
> (312) 543-7354 (Cellular)
> gjordan@jz-llc.com
>
> **Notice from Jordan & Zito LLC **

Plaintiffs were confused and advised Nelson, asking him to help them understand what was happening.

[60]    On or about November 16, 2023, Nelson emailed Lipp and Ransdell at their Great Point email addresses disputing Rah Rah's obligation to pay any fees other than a $15,000 engagement fee.

[61]    On or about November 17, 2023, Lipp responded to Nelson and copied Ransdell and Woodside. A copy of this email, along with Nelson's original email from November 16, is attached as Exhibit H.

[62]     In this email, Lipp pushed hard for Great Point to be paid a fee consistent with the

Engagement Agreement. Lipp begins by making clear that this venture and his efforts on behalf

of Rah Rah were approved by Great Point:

> David, you and I were introduced to each other by John Griffin, an individual that has become your right-hand man responsible for signing up high schools and youth groups in the Twin Cities for RahRah! The reason he introduced us is because you were frustrated by your inability to raise capital during the prior three years and he knew I could help you. You specifically asked me to help you raise $2 million. After spending two days with you, I was impressed by you and your business idea, and explained my situation of having a securities license held by Great Point Capital. That required me to get permission from Great Point Capital to raise money for you because I am not legally able to raise money for any business or even be involved in the business activity of another company without their knowledge and approval. I sought approval and received it with the understanding that I would assume the responsibility for raising all the money myself without the help of other advisors at Great Point Capital. It is important to note that Great Point Capital has an excellent distribution network that could come in handy if RahRah has additional funding needs going forward, which I believe will be the case.

[63]     Lipp then lauded the work he and Great Point did in obtaining the investment for

Rah Rah:

> In addition to introducing you to high quality angel investors you otherwise would not have met, 1.) I have given you guidance and advice on improving your presentation material, 2.) given you feedback on making better presentations to investors (choice of words, proper dresscode, 3.) done competitor analysis, 4.) helped you with financial projections and assumptions 5.) assisted you with proper valuation in the current market, 6.) assisting you in assessing term sheets and choosing investors, and 7.) helping you better position the company in the marketplace.   We have spent a ton of time together over the past almost nine months. All this was done to increase our probability of success.

[64]     Lipp was then even more specific about the investment at issue and those

involved, as follows:

> Let's break down the current situation, the three primary parties, and how each party has benefited from the others contributions and a successful $2 million raise . The three parties involved are as follows:
>
> 1. David Nelson
> 2. Ben Woodside and Ray
> 3. Great Point Capital

**David Nelson** would have never met Ben had I not made multiple calls to Ben to get a lunch meeting scheduled in Fargo. It was my responsibility to get David in front of good strategic investors, and I did that when I made this introduction. A successful $2 million raise provides the capital for David to get a **$200,000 base salary** plus the opportunity for a sizeable bonus over time as revenue at RahRah develops. In addition, **David's net worth increases by $3 million** on paper as a 60% owner of a $5 million company.

**Ben Woodside** would have never met David or heard about RahRah if I hadn't convinced him to meet us for lunch in Fargo. I had positioned the opportunity as something that was right up Ben's wheelhouse given his connections in ND, love of sports, his competitive zeal, and his work ethic. In addition, I suggested that David give Ben the entire state of North Dakota to develop as a territory for free with no licensing fee and an attractive revenue split if he would help us raise $500,000 in investment capital in the Fargo area. The gross revenue for RahRah in ND over time is expected to be at least $3 million within a few years. Ben's 35% revenue share will result in over $1 million in revenue per year and an expected net profit of between **$400,000 and $500,000 per year** after paying for the salespeople expenses. This means that Ben is actually getting paid for investing in RahRah! I couldn't have structured a better deal for anyone. The other thing Ben needs to realize, is that when I met David he wanted an $8 million pre-raise valuation of RahRah. Ben, you're now paying a $3 million valuation because of this lengthy and tedious price discovery process and negotiation I have gone through with David. That means the $1 million you and Ray are investing is now going to buy 25% of the company instead of 11% of the company. To make the illustration simple, that means if there was no additional money raised, and the valuation of RahRah was to balloon to $100 million, that $1 million would go to $25 million instead of $11 million if you had paid the higher $ 8 million valuation to begin with.

**Great Point Capital** would receive roughly $80,000 in total incentive fees plus the $15,000 retainer to be split between Brady, Joe Ransdell, expenses, and Great Point Capital for the first $1 million raised. And this is a one-time fee. Great Point would receive and additional $64,000 when the last $800,000 is raised. Any investment professional would pay somebody a few hundred thousand dollars if it increased their net worth multi-millions of dollars. I have added incredible value for both of you and I shouldn't have to point that out.

[65]    Woodside and Kvalvog did not receive any follow-up emails after this one. They were not aware at the time whether or not any fees were paid by Nelson and/or Rah Rah to Great Point and/or Lipp.

### Great Point's Post-Sale Activities

[66]    Following the sale, Great Point began distancing itself from Lipp and Ransdell.

[67]    According to a report filed with FINRA and available on the Broker Check website, Great Point allowed Ransdell to resign on or about December 31, 2023. According to the statement it filed:

> Ransdell was never authorized by GPC to proceed with capital raising for a company known as Tristate Solutions LLC (d/b/a RahRah "RahRah"). Despite this fact, Ransdell continued to be involved with RahRah and actually executed a "Finder's Fee" agreement without obtaining approval for this contact by GPC. This is a violation of GPC Rules of Supervisory Procedure. As a result of this activity, Ransdell's U-5 was amended to reflect the violation of procedures. GPC is also investigating Ransdell's role in any offering of RahRah's equity. No conclusion has yet been reached.

[68]    According to a report filed with FINRA and available on the Broker Check website, Great Point allowed Lipp to resign on or about April 9, 2025. According to the statement it filed:

> Lipp was never authorized by GPC to be involved in fundraising for a firm named RahRah (TriState Solutions LLC d/b/a RahRah, "RahRah"). He had at one time brought RahRah to GPC and inquired whether GPC wished to have involvement and was told after review of RahRah's proposal GPC was not interested and would not participate. GPC told Lipp that if he separately wished to be involved in an outside business activity with RahRah as a finder (as opposed to a private securities transaction) he would need to submit a written request to do so as required by FINRA Rule 3270. GPC would then review his submission. He never made any request but apparently continued to be involved with RahRah, which is a violation of GPC's rules and procedures. One customer claims Lipp mishandled the involvement with RahRah to the customer's detriment. As a result of the discovery by GPC, Lipp's association with GPC was terminated.

[69]    Assuming without conceding that these statements are true, Great Point, based on its own admissions, knew that Lipp and Ransdell were engaged with Nelson and Rah Rah.

[70]    Assuming without conceding that these statements are true, Great Point, based on its own admissions, knew that Ransdell was seeking fees for his activities.

[71]  Through the fall of 2023, Lipp communicated with Woodside about Rah Rah through the Great Point email system.

[72]  In early November 2023, Lipp wrote a lengthy email to Woodside through the Great Point email system demanding payment to Great Point based on Woodside and Kvalvog's investment in Rah Rah, described in detail above.

[73]  Great Point allegedly allowed Ransdell to resign in December 2023, after Woodside and Kvalvog had invested in Rah Rah and after Lipp had sought to collect a fee for that investment through the Great Point email system.

[74]  At no time did Great Point contact Woodside or Kvalvog to clarify its role in this matter and warn them that it allegedly had no role in the investment.

[75]  Great Point allegedly terminated Lipp in 2025, roughly 18 months after it had allegedly terminated Ransdell for the same activity. On information and belief, Great Point took no steps during this time to determine whether sales had been made.

**Rah Rah's Subsequent Activity**

[76]  Based on the representations of Nelson and Lipp, Woodside and Kvalvog understood that their funds would be directed to finalizing the Rah Rah app.

[77]  Instead, Nelson immediately began using Rah Rah's funds to pay himself, his wife Emily, and Nate McKinley.

[78]  On November 22, 2023, Nelson caused Rah Rah to pay him $33,000.

[79]  On December 1, 2023, Nelson caused Rah Rah to pay him $16,666.

[80]  On November 22, 2023, Nelson caused Rah Rah to pay "Nate Dog Inc" $4,500. He caused further payments to Nate Dog Inc. of $5,500 on November 28, 2023 and $10,000 on December 1, 2023.

[81]    On information and belief, Nate Dog Inc. is a company owned or controlled by Nate McKinley, a friend of Nelson's who allegedly was finding Rah Rah customers in Chicago.

[82]    Within the first two weeks, based on the foregoing and other payments to employees, over $78,000 had been transferred out of Rah Rah and to Nelson or his family and friends.

[83]    Between January and September of 2024, when Rah Rah discontinued operations, Nelson caused Rah Rah to make aggregate payments to the following persons in the following amounts (i) Dave Nelson, $134,000; (ii) his wife Emily Nelson, $35,400; (iii) other employees, $393,000. These payments total $562,400.

[84]    In addition, between November 2023 and September 2024, Nelson caused Rah Rah to pay legal bills of approximately $58,706. Some of these bills were for services prior to Woodside and Kvalvog's decision to invest in Rah Rah.

[85]    In sum, based on the best information available, Nelson caused Rah Rah to spend approximately $700,000 on payments to Nelson, his family and friends, and preexisting or new business expenses other than the development of the Rah Rah app.

[86]    During this time, no additional investors put money into Rah Rah.

[87]    In addition, Woodside and Kvalvog discovered during that time that Rah Rah did not in fact have any paying customers. On information and belief, despite the claims of Lipp and Nelson, Rah Rah never had any paying customers. The detailed descriptions of supposed customer groups were false.

[88]    On information and belief, the Rah Rah app was never completed. Woodside and Kvalvog understand that the software development company hired to finalize the app still has not

been paid for past work, let alone for the work required to complete the app. The representations regarding the use of funds for the purpose were false.

### Count I – Recission Based on Violation of Noth Dakota Securities Act
### (All Defendants)

[89]    Plaintiffs hereby incorporate all allegations set forth in the preceding paragraphs.

[90]    N.D. Cent. Code § 10-04-17(1) provides in part:

Every sale or contract for sale made in violation of any of the provisions of this chapter, or of any rule or order issued by the commissioner under any provisions of this chapter, shall be voidable at the election of the purchaser. The person making such sale or contract for sale, and every director, officer, or agent of or for such seller who shall have participated or aided in any way in making such sale shall be jointly and severally liable to such purchaser who may sue either at law or in equity to recover the full amount paid by such purchaser, together with all taxable court costs, interest as provided in this subsection, and reasonable attorney's fees, less the amount of any income received on the securities, upon tender to the seller, in person or in open court, of the securities sold or of the contracts made[.]

[91]    N.D. Cent. Code § 10-04-17(6) provides:

Each of the following persons are liable jointly and severally with and to the same effect as persons liable under this section:

a.      A person who controls, supervises, or serves as an officer, director, or managing partner of a person liable under this section, unless the person did not know, and in the exercise of reasonable care could not have known, of the conduct by reason of which the liability is alleged to exist.

b.      An individual who is an employee of or associated with a person liable under this section and who materially aids the conduct giving rise to the liability, unless the individual did not know, and in the exercise of reasonable care could not have known, of the conduct by reason of which the liability is alleged to exist.

c.      A person who is a broker-dealer, agent, investment adviser, or investment adviser representative that materially aids the conduct giving rise to the liability under this section, unless the person did not know, and in the exercise of reasonable care could not have known, of the conduct by reason of which the liability is alleged to exist.

[92]    N.D. Cent. Code § 10-04-10 generally provides that it is unlawful to transact business in North Dakota as a broker-dealer, agent, or investment advisor unless the person is registered as such or is exempt from registration.

[93]    At the time of the sale here, Lipp was not registered as a broker-dealer, agent, or investment advisor with the North Dakota Securities Commissioner.

[94]    On information and belief, Lipp is not otherwise exempt from registration under N.D. Cent. Code § 10-04-10.

[95]    Because Lipp was neither registered as an agent/adviser nor exempt from registration, the sale of the Rah Rah Units was in violation of the North Dakota Securities Act and is subject to recission under N.D. Cent. Code § 10-04-17.

[96]    At the time of the sale here, Ransdell was not registered as a broker-dealer, agent, or investment advisor with the North Dakota Securities Commissioner.

[97]    On information and belief, Ransdell is not otherwise exempt from registration under N.D. Cent. Code § 10-04-10.

[98]    Because Ransdell was neither registered as an agent/adviser nor exempt from registration, the sale of the Rah Rah Units was in violation of the North Dakota Securities Act and is subject to recission under N.D. Cent. Code § 10-04-17.

[99]    All Defendants should be held jointly and severally liable for recission.

[100]   Rah Rah is the seller of the Rah Rah Units and is therefore liable for recission.

[101]   Nelson is an officer of the seller of the Rah Rah Units who participated in the sale and is therefore liable for recission.

[102]   Lipp is a broker who materially participated in the sale of the Rah Rah Units – as described by Lipp himself in writing – to Plaintiffs and is therefore liable for recission.

[103]   Ransdell is a broker who materially participated in the sale of the Rah Rah Units to Plaintiffs and is therefore liable for recission.

[104]   The material participation of Lipp and Ransdell was conducted through the platform of, and in their role as employees of, Great Point.

[105]   Great Point knew or should have known of Lipp and Ransdell's participation, which was conducted through its platform.

[106]   Great Point was responsible for employing and supervising Lipp and Ransdell, who were its agents. See infra Counts VI and VII.

[107]   Great Point is therefore liable for recission.

[108]   Woodside and Kvalvog are entitled to an order of recission jointly and severally against Rah Rah, Nelson, Lipp, Ransdell, and Great Point, as well as interest and attorney's fees as allowed by law. Woodside and Kvalvog will tender the Rah Rah Units in exchange for such recission.

### Count II – Recission Based on Fraud in Connection with the Sale of Securities
### (All Defendants)

[109]   Plaintiff hereby incorporates all allegations set forth in the preceding paragraphs.

[110]   N.D. Cent. Code § 10-04-17(1) provides in part:

Every sale or contract for sale made in violation of any of the provisions of this chapter, or of any rule or order issued by the commissioner under any provisions of this chapter, shall be voidable at the election of the purchaser. The person making such sale or contract for sale, and every director, officer, or agent of or for such seller who shall have participated or aided in any way in making such sale shall be jointly and severally liable to such purchaser who may sue either at law or in equity to recover the full amount paid by such purchaser, together with all taxable court costs, interest as provided in this subsection, and reasonable attorney's fees, less the amount of any income received on the securities, upon tender to the seller, in person or in open court, of the securities sold or of the contracts made[.]

[111]  N.D. Cent. Code § 10-04-15 provides in part that:

It shall be a fraudulent practice and it shall be unlawful:

1.      For any person knowingly to subscribe to, or make or cause to be made, any material false statement or representation in any application, financial statement, or other document or statement required to be filed under any provision of this chapter, or to omit to state any material statement or fact in any such document or statement which is necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.

2.      For any person, in connection with the offer, sale, or purchase of any security, directly or indirectly, to:

   a.      Employ any device, scheme, or artifice to defraud;

   b.      Make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or

   c.      Engage in any act, practice, or course of business which operates or would operate as a fraud or deception upon purchasers or the public.

[112]  The statements and financial projections of Lipp and Nelson about Rah Rah as outlined herein were fraudulent, in that they were untrue and incomplete, and were intended to influence Woodside and Kvalvog to invest in the Rah Rah Units.

[113]  Among other things, and as outlined above, Nelson fraudulently represented that Woodside and Kvalog's investment would be used to develop the application, that Rah Rah already had a significant customer base with additional customers lined up, and that the only thing preventing Rah Rah from being fully operational was the completion of its app and that investment dollars would be used for that purpose.

[114]  Among other things, and as outlined above, Lipp and Ransdell fraudulently represented that Great Point approved of and backed the investment.  Furthermore, despite Lipp

and Ransdell representing that they had conducted significant research and due diligence on the company, Lipp and Ransdell failed to disclose key facts regarding Rah Rah that they knew or should have known including its lack of customers.

[115]   These statements were false and misleading.

[116]   These statements were made to induce reliance on the part of Woodside and Kvalvog.

[117]   Woodside and Kvalvog did in fact rely on these statements and financial projections when they decided to invest in the Rah Rah Units.

[118]   All Defendants should be held jointly and severally liable for recission.

[119]   Rah Rah is the seller of the Rah Rah Units and is therefore liable for recission.

[120]   Nelson is an officer of the seller of the Rah Rah Units who participated in the sale and is therefore liable for recission.

[121]   Lipp is a broker who materially participated in the sale of the Rah Rah Units – as described by Lipp himself in writing – to Plaintiffs and is therefore liable for recission.

[122]   Ransdell is a broker who materially participated in the sale of the Rah Rah Units – as described by Lipp in writing – to Plaintiffs and is therefore liable for recission.

[123]   The material participation of Lipp and Ransdell was conducted through the platform of, and in their role as employees of, Great Point.

[124]   Great Point knew of Lipp and Ransdell's material participation.

[125]   Great Point was responsible for employing and supervising Lipp and Ransdell, who were its agents. See infra Counts VI and VII.

[126]   Great Point is therefore liable for recission.

[127]   Woodside and Kvalvog are entitled to an order of recission jointly and severally against Rah Rah, Nelson, Lipp, Ransdell, and Great Point, as well as interest and attorney's fees as allowed by law. Woodside and Kvalvog will tender the Rah Rah Units in exchange for such recission.

### Count III – Securities Fraud
### (All Defendants)

[128]   Plaintiffs hereby incorporate all allegations set forth in the preceding paragraphs.

[129]   The statements of Lipp and Nelson with regard to Rah Rah as outlined herein were fraudulent, in that they were untrue and incomplete and were intended to influence Woodside and Kvalvog to invest in the Rah Rah Units.

[130]   Among other things, and as outlined above, Nelson fraudulently represented that Woodside and Kvalog's investment would be used to develop the application, that Rah Rah already had a significant customer base with additional customers lined up, and that the only thing preventing Rah Rah from being fully operational was the completion of its app and that investment dollars would be used for that purpose.

[131]   Among other things, and as outlined above, Lipp and Ransdell fraudulently represented that Great Point approved of and backed the investment. Furthermore, despite Lipp and Ransdell representing that they had conducted significant research and due diligence on the company, Lipp and Ransdell failed to disclose key facts regarding Rah Rah that they knew or should have known including its lack of customers.

[132]   These statements were false and misleading.

[133]   These statements were made to induce reliance on the part of Woodside and Kvalvog.

[134]    Woodside and Kvalvog did in fact rely on these statements when they decided to invest in the Rah Rah Units.

[135]    Woodside and Kvalvog have been harmed by such fraud in an amount to be proven at trial.

[136]    All Defendants should be held jointly and severally liable for such damages.

[137]    Rah Rah is the seller of the Rah Rah Units and is therefore liable for such damages.

[138]    Nelson is an officer of the seller of the Rah Rah Units who participated in the sale and is therefore liable for such damages.

[139]    Lipp and Ransdell materially participated in the sale of the Rah Rah Units to Plaintiffs and is therefore liable for such damages.

[140]    Lipp and Ransdell's material participation was conducted through the platform of, and in his role as an employee of, Great Point.

[141]    Great Point was responsible for employing and supervising Lipp and Ransdell.

[142]    Great Point is therefore liable for such damages.

[143]    Therefore, in the alternative to recission, Woodside and Kvalvog are entitled to a judgment in an amount to be proven at trial jointly and severally against all defendants.

## COUNT IV – Common Law Fraud
### (Nelson, Ransdell, Rah Rah, Lipp, and Great Point)

[144]    Plaintiffs hereby incorporate all allegations set forth in the preceding paragraphs.

[145]    The statements of Lipp and Nelson with regard to Rah Rah as outlined in paragraphs 24 to 42 were fraudulent, in that they were untrue and incomplete and were intended to influence Woodside and Kvalvog to invest in the Rah Rah Units.

[146]   Among other things, and as outlined above, Nelson fraudulently represented that Woodside and Kvalog's investment would be used to develop the application, that Rah Rah already had a significant customer base with additional customers lined up, and that the only thing preventing Rah Rah from being fully operational was the completion of its app and that investment dollars would be used for that purpose.

[147]   Among other things, and as outlined above, Lipp and Ransdell fraudulently represented that Great Point approved of and backed the investment.  Furthermore, despite Lipp and Ransdell representing that they had conducted significant research and due diligence on the company, Lipp and Ransdell failed to disclose key facts regarding Rah Rah that they knew or should have known including its lack of customers.

[148]   These statements were false and misleading.

[149]   These statements were made to induce reliance on the part of Woodside and Kvalvog.

[150]   Woodside and Kvalvog did in fact rely on these statements when they decided to invest in the Rah Rah Units.

[151]   Woodside and Kvalvog have been harmed by such fraud in an amount to be proven at trial.

### COUNT V – Breach of Fiduciary Duty
### (Lipp, Ransdell and Great Point)

[152]   Plaintiffs hereby incorporate all allegations set forth in the preceding paragraphs.

[153]   Defendants Lipp, Ransdell and Great Point owed fiduciary duties to Woodside and Kvalvog.

[154]   Under common law, a fiduciary duty arises when one party places trust and confidence in another, and the latter accepts that trust and assumes a position of influence. As stated at *37 Am. Jur. 2d Fraud and Deceit § 37*, a fiduciary relationship exists where "confidence is reposed on one side, and [there is] resulting superiority and influence on the other." This standard applies to brokers and investment advisers who solicit investments and provide recommendations to clients.

[155]   Lipp and Ransdell, as FINRA-registered representatives, held themselves out as trusted financial professionals, emphasizing their ethical obligations and affiliation with Great Point Capital, a registered broker-dealer. They also emphasized Great Point's status as a registered broker-dealer in the Finder's Fee Agreement. They used their positions to induce Plaintiffs to invest $1,000,000 in RahRah Solutions LLC, a speculative startup.

[156]   The fiduciary duties of an investment adviser or broker include the duty (i) not to misrepresent any material fact[1]; (ii) to disclose material facts[2]; (iii) to disclose the risks of particular transactions, securities or strategies[3]; (iv) not to recommend unsuitable securities[4], (v) to monitor

---

[1] *See, e.g., S.E.C. v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963) (noting that an investment adviser is a fiduciary and that "[c]ourts have imposed on a fiduciary … an affirmative obligation 'to employ reasonable care to avoid misleading' his clients" (citations omitted)); *U.S. v. Dial*, 757 F.2d 163, 168 (7th Cir.), *cert denied*, 474 U.S. 838 (1985).

[2] *Capital Gains*, 375 U.S. at 194 (noting that an investment adviser is a fiduciary and that "[c]ourts have imposed on a fiduciary an affirmative duty of 'utmost good faith, and full and fair disclosure of all material facts'" (citation omitted)); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 901 F.2d 1124, 1128 (D.C. Cir. 1990).

[3] *See, e.g., Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 461 F. Supp. 951, 953 (E.D. Mich. 1978) (confirming duty to "explain forthrightly the practical impact and potential risks of the course of dealing in which the broker is engaged" (citation omitted)), *aff'd without opinion*, 647 F.2d 165 (6th Cir. 1981).

[4] *See, e.g., Leib*, 461 F. Supp. at 953 (one handling a discretionary account or an account over which he or she has *de facto* control has duty to manage the account in a manner comporting with the needs and objectives of the customer).

the performance of the customer's account[5]; and (vi) to "keep his customer informed as to each completed transaction[6]." There is an additional duty to explain the possible consequences of the trading to the customer. *Leib*, 461 F. Supp. at 953–54.

[157]    Finally, as a fiduciary, Great Point's, Lipp's and Ransdell's duties were ongoing and continuous. *See Twomey v. Mitchum, Jones & Templeton, Inc.*, 262 Cal. App. 2d 690, 726 (Cal. Ct. App. 1968) (finding a continuing obligation to invest client's funds in suitable securities); *Erlich v. First Nat. Bank of Princeton*, 505 A.2d 220, 235–36 (N.J. Super. Ct. Law Div. 1984) (noting that an investment adviser has an ongoing duty to refuse to approve risky, imprudent investment strategies, and noting that the "duty encompassed an obligation not to recommend or approve purchases inconsistent with diversification"); *cf. Koch v. Dwyer*, 1999 WL 528181, at *6 (S.D.N.Y. July 22, 1999) (noting that the "plaintiff may pursue a claim for breach of fiduciary duty based on continued retention of an imprudent investment"), *opinion clarified on denial of reconsideration*, 2000 WL 174945 (S.D.N.Y. Feb. 15, 2000).

[158]    Lipp and Ransdell violated these duties in several ways. They misrepresented RahRah's business prospects, falsely claiming that the company had more than 15 high schools, 10,000 youth hockey players, and multiple volleyball organizations committed to using its app. They also misrepresented the status of the app's development and the intended use of investor funds, which were instead diverted to personal payments to insiders. These misstatements were material and directly induced Plaintiffs to invest.

[159]    Moreover, Lipp, Ransdell and Great Point failed to disclose key risks and conflicts of interest. Lipp and Ransdell did not inform Plaintiffs that Great Point Capital had declined to

---

[5] *See, e.g., id.* (confirming duty to "keep informed regarding the changes in the market which affect his customer's interest and act responsively to protect those interests").

[6] *See, e.g., id.*

approve the RahRah offering, nor did they disclose the Finder's Fee Agreement under which Great Point was to receive a 9% commission on invested funds. This omission violated their duty to disclose material facts and conflicts of interest. Additionally, the recommendation of RahRah as a "guaranteed win" was unsuitable given the company's lack of revenue, incomplete product, and absence of paying customers. This conduct breached the duty to recommend only suitable investments, as articulated in *Twomey v. Mitchum, Jones & Templeton*, 262 Cal. App. 2d 690, 726 (Cal. Ct. App. 1968), which recognized a continuing obligation to invest client funds in suitable securities.

[160]   Great Point Capital also breached its fiduciary duties by failing to supervise its representatives and prevent the misconduct. As the employer and supervisory entity, Great Point had a duty to monitor Lipp and Ransdell's activities, especially given their use of firm email accounts and their solicitation of investments under the guise of firm approval. This failure is further evidenced by multiple regulatory findings – including SEC and FINRA sanctions – documenting Great Point's inadequate supervisory systems and written procedures, specifically its lack of oversight regarding outside business activities and associated persons. Regulators have repeatedly found that Great Point did not maintain or enforce procedures reasonably designed to detect, prevent, or respond to misconduct, including failures to review transactions in outside accounts and to supervise representatives' activities, demonstrating a systemic disregard for its supervisory responsibilities. Great Point's failure to intervene, investigate, or warn Plaintiffs constitutes a breach of its fiduciary obligations under principles of respondeat superior and control person liability.

[161]   Moreover, Great Point compounded this failure by delaying action for an additional 18 months towards Lipp after he used the firm's emails and servers to perpetrate the

same misconduct as Ransdell. The firm's inaction allowed the misconduct to continue unchecked, resulting in substantial financial harm to Plaintiffs.

[162]    In sum, Defendant Lipp, Ransdell and Great Point's conduct violated their fiduciary duties by misrepresenting material facts, failing to disclose risks and conflicts, recommending unsuitable investments, and failing to supervise and protect Plaintiffs' interests.

[163]    Woodside and Kvalvog were damaged because of Lipp, Ransdell and Great Point's breaches of fiduciary duty, in an amount to be determined at trial, plus fees, costs and interest as allowed by law.

### COUNT VI
### Respondeat Superior/Negligent Supervision/Controlling Person
### (Great Point)

[164]    Plaintiffs hereby incorporate all allegations set forth in the preceding paragraphs.

[165]    At all relevant times, Lipp and Ransdell were FINRA-registered and affiliated with FINRA member firm Great Point. A "broker-dealer is a controlling person under § 20(a) with respect to its registered representatives." *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1573 (9th Cir. 1990); *see also* 15 U.S.C. § 78t.

[166]    Under the securities laws, a broker-dealer has an obligation to put in place procedures adequate to monitor its broker and fulfill its duty to supervise.

[167]    When faced with a controlling or negligent supervision/respondeat superior claim, a broker-dealer must prove that it maintained and enforced a reasonable and proper system of supervision and internal control. *Hollinger*, 914 F.2d at 1576; *see also Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111, 1120 (5th Cir. 1980) (broker-dealer must show it "diligently enforce[d] a proper system of supervision and control").

[168]    At all relevant times, Great Point failed properly to supervise Lipp and Ransdell and failed to put in place adequate supervisory policies and procedures overseeing their activities in selling the Rah Rah Units to Woodside and Kvalvog.

[169]    Woodside and Kvalvog were damaged because of the failure to supervise by Great Point, which aided and abetted Lipp and Ransdell's improper activities, in an amount to be determined at trial, plus fees, costs and interest as allowed by law.

### COUNT VII
### Principal-Agent Liability
### (Great Point)

[170]    Plaintiffs hereby incorporate all allegations set forth in the preceding paragraphs.

[171]    Lipp and Ransdell were agents of Great Point.

[172]    Under North Dakota law, "An agent represents the agent's principal for all purposes within the scope of the agent's actual or ostensible authority, and all the rights and liabilities which would accrue to the agent from the transactions within such limit, if they had been entered into on the agent's own account, accrue to the principal." N.D. Cent. Code § 3-03-01.

[173]    North Dakota law further provides that, "[A] principal is responsible to third persons for the negligence of the principal's agent in the transaction of the business of the agency, including wrongful acts committed by the agent in and as a part of the transaction of the business, and for the agent's willful omission to fulfill the obligations of the principal." N.D. Cent. Code § 3-03-09.

[174]    In other words, a principal is liable for the deceitful or fraudulent acts of its agents, which are committed in the course of the business the agent was appointed to conduct. *United States v. Johnson*, 541 F.2d 710, 712 (8th Cir. 1976).

[175]   At all relevant times, Lipp and Ransdell were in fact agents of Great Point. Great Point knew about and is responsible for the fraudulent activities of Lipp and Ransdell.

[176]   In the alternative, and at a minimum, Lipp and Ransdell had the ostensible authority to act on behalf of Great Point in their dealings with Woodside and Kvalvog.

[177]   Woodside and Kvalvog were damaged by the activities of Lipp and Ransdell as described herein. Because Lipp and Ransdell were Great Point's agents, Great Point is liable to Woodside and Kvalvog for all damages caused by Lipp and Ransdell, in an amount to be determined at trial, plus fees, costs and interest as allowed by law.

WHEREFORE, Plaintiff prays for relief as follows:

1.    That the Court award each Plaintiff the principal amount of at least $500,000 plus interest and attorneys' fees as allowed by law;

2.    That the Court award Plaintiff its costs and disbursements; and

3.    That the Court award Plaintiff such other relief as the Court deems just and equitable.

Respectfully submitted this 19th day of December, 2025.

By:    /s/ Michael Raum
       Michael S. Raum #05676
       Todd E. Zimmerman #05459
       Abigale R. Griffin #09044
       **FREDRIKSON & BYRON, P.A.**
       51 Broadway, Suite 400
       Fargo, ND 58102
       Telephone: (701) 237-8200
       mraum@fredlaw.com
       tzimmerman@fredlaw.com
       agriffin@fredlaw.com

       Sandra S. Smalley-Fleming (pro hac vice
       forthcoming)
       Ryan C. Young (pro hac vice forthcoming)
       60 South Sixth Street, Suite 1500
       Minneapolis, MN 55402
       (612) 492-7000
       ssmalleyfleming@fredlaw.com
       ryoung@fredlaw.com

       Attorney for Plaintiffs

# Exhibit A

4/3/25, 6:19 PM                                           Gmail - RahRah - Executive Summary

                                      Ben Woodside <bmwoodside@gmail.com>

## RahRah - Executive Summary
2 messages

**David Nelson** <dnelson@rahrahsolutions.com>
To: bmwoodside@gmail.com                                  Mon, Sep 11, 2023 at 4:55 PM
Cc: Brady Lipp <blipp@gpcchi.com>

Hi Ben,

I am looking forward to meeting you and discussing the RahRah investment opportunity.

We are excited about this presentation with you. I have our meeting scheduled at 11am on Wednesday the 13th at the Tavern Bar and Grill.

Brady mentioned you have until 1pm to discuss. I wanted to send you this Executive Summary in advance, so you could look it over before Wednesday.

I have also included a bio slide of myself and my career journey in youth fundraising.

See you on Wednesday.

Best,

David


*David Nelson*
*Founder + CEO*
*RahRah*
*(612)-867-4088*





# RAHRAH

***Because every kid deserves a cheering section!***


**2 attachments**

📄 **RahRah Executive Summary - Ben Woodside.pdf**
    1296K

# Exhibit B

# DISCLAIMER

This presentation has been prepared by Tri State Solutions, LLC doing business as RahRah (the "Company"), solely for informational purposes in its presentation to prospective investors held in connection with the proposed private placement of equity (the "Securities") of the Company or other promotional purposes. This presentation and any oral statements made in connection with this presentation do not constitute an offer to sell, or a solicitation of an offer to buy, or a recommendation to purchase, any securities in any jurisdiction, nor shall there be any sale, issuance or transfer of any securities in any jurisdiction where, or to any person to whom, such offer, solicitation or sale may be unlawful under the laws of such jurisdiction. This presentation does not constitute either advice or a recommendation regarding any securities. Any offer to sell Securities will be made only pursuant to a definitive securities purchase agreement. The Securities have not been and will not be registered under the US Securities Act of 1933, as amended (the "Securities Act"), and will be offered or sold in the United States only by virtue of Section 4(a)(2) of the Securities Act, and specifically the provisions of Rule 506 of Regulation D promulgated thereunder, to "accredited investors" as defined in Rule 501(a) of Regulation D under the Securities Act.

The information contained in this presentation has not been independently verified. No representation or warranty express or implied is made as to, and no reliance should be placed on, the fairness, accuracy, completeness or correctness of the information or any opinion contained herein. The information contained in this presentation should be considered in the context of the circumstances prevailing at the time and will not be updated to reflect material developments that may occur after the date of the presentation. Neither the Company nor any of its affiliates, officers, directors/managers or advisors shall have any civil, criminal or administrative liability whatsoever (wilful, in negligence or otherwise) for any loss arising from any use of this presentation or its contents or otherwise arising in connection with this presentation. Recipients of this presentation are not to construe its contents, or any prior or subsequent communications from or with the Company or its representatives as investment, legal or tax advice. In addition, this presentation does not purport to be all-inclusive or to contain all of the information that may be required to make a full analysis of the Company or an investment in the Company. Recipients of this presentation should each make their own evaluation of the Company and the Securities and of the relevance and adequacy of the information and should make such other investigations as they deem necessary.

This document is not intended for distribution to, or use by any person or entity in any jurisdiction where such distribution or use would be contrary to applicable laws or regulations. By reviewing this document each recipient is deemed to represent that it is a person in whose possession this document may be lawfully delivered in accordance with the laws and regulations of the jurisdiction in which it is located. Other persons should not rely or act upon this presentation or any of its contents.

**Forward-Looking Statements**
This presentation contains certain statements that constitute forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21 E of the Securities Exchange Act of 1934, as amended. These statements typically contain words such as "believes", "expects", "anticipates", "intends", "plans", "foresees", or other words or phrases of similar import. Similarly, statements that describe the Company's objectives, plans or goals also are forward-looking statements. All such forward-looking statements are subject to certain risks and uncertainties that could cause actual results to differ materially from those contemplated by the relevant forward-looking statement. There can be no assurance that the results and events contemplated by the forward-looking statements contained herein will in fact occur. While we consider these expectations and assumptions to be reasonable, they are inherently subject to significant business, economic, competitive, regulatory and other risks, contingencies and uncertainties, most of which are difficult to predict and many of which are beyond our control.

None of the future projections, expectations, estimates or prospects in this presentation should be taken as forecasts or promises nor should they be taken as implying any indication, assurance or guarantee that the assumptions on which such future projections, expectations, estimates or prospects have been prepared are correct or exhaustive or, in the case of assumptions, fully stated in the presentation. The Company also cautions that forward-looking statements are subject to numerous assumptions, risks and uncertainties, which change over time and which may be beyond the Company's control. The Company assumes no duty to and does not undertake to update any forward-looking statements to reflect actual results, changes in assumptions or changes in factors affecting these statements.

**Use of Projections**
This presentation contains projected financial information with respect to the Company. Such projected financial information constitutes forward-looking information, and is for illustrative purposes only and should not be relied upon as necessarily being indicative of future results. The assumptions and estimates underlying such financial forecast information are inherently uncertain and are subject to a wide variety of significant business, economic, competitive and other risks and uncertainties. Actual results may differ materially from the results contemplated by the financial forecast information contained in this presentation, and the inclusion of such information in this presentation should not be regarded as a representation by any person that the results reflected in such forecasts will be achieved.

**Industry Data**
Certain data in this presentation was obtained from various external data sources, and the Company has not verified such data with independent sources. Accordingly, the Company makes no representations as to the accuracy or completeness of that data, and such data involves risks and uncertainties and is subject to change based on various factors.

This presentation is strictly confidential, is being given solely for your information and for your use and may not be copied, reproduced, redistributed or passed on, directly or indirectly, in whole or in part, by any medium to any other person in any manner. Any failure to comply with these restrictions may constitute a violation of applicable securities laws.

© 2023 RahRah. All rights reserved.

**RAHRAH.**

**RahRah!**

# Table of Contents

## Growth Loan Fund Program Application ......................................................... 1
Custom Section ............................................................................................ 1

## Executive Summary .................................................................................... 2
Opportunity ................................................................................................. 2
Expectations ................................................................................................ 7

## Execution ................................................................................................. 10
Marketing & Sales ...................................................................................... 10
Operations .................................................................................................. 11
Milestones & Metrics .................................................................................. 13

## Company ................................................................................................. 16
Overview ..................................................................................................... 16
Team ........................................................................................................... 17

## Financial Plan ......................................................................................... 19
Forecast ...................................................................................................... 19
Statements .................................................................................................. 22
Business Filings ......................................................................................... 28

## Appendix ................................................................................................. 30

CONFIDENTIAL – DO NOT DISSEMINATE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

# Growth Loan Fund Program Application

## Custom Section

Growth Fund Application – Tri-State Solutions, LLC dba RahRah

CONFIDENTIAL – DO NOT DISSEMINATE. This business plan contains confidential, trade -secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**
2

# Executive Summary

## Opportunity

### Why RahRah?

RahRah Pitch Deck Link

With over 23 years of experience in the fundraising industry, David Nelson the Founder & CEO of RahRah! is highly trained in all things fundraising for youth organizations.  Helping schools and youth organizations raise close to $20,000,000 profit in print discount cards ONLY in the states of North and South Dakota, and Minnesota.  David works and builds relationships with coaches, administrators, booster leads and most importantly the participants in these organizations.

Although printed discount cards have been successful over this period, he recognized that the future of fundraising will be in tech, with mobile and renewable income opportunities for the organizations he services.  That is why he developed RahRah! in 2019 to get ahead of the competition with a fundraising sales model that no other company is focusing on.  Listening to his coaches, parents, and local businesses who participate in the discount card program, he pivoted fully by starting development of RahRah! 2.0 in the summer of 2022.

David has been an athlete since he was 8 years old and always had a passion for all sports and activities.  His passion for success over the years being active in sports has always transferred over to being highly successful in sales and management and working with the teams he services.  There is no one who knows the youth fundraising landscape better and who can lead others like-minded RahRah territory owners that will disrupt the industry.

### Problem

#### *LOCAL BUSINESSES(FREE)*

Local small businesses need help with marketing. Print is outdated and digital marketing is expensive and time-consuming.  RahRah will help these businesses provide a platform that they can use to rely on, reaching customers fast and easy with traction they can actually evaluate.  Our digital marketing and advertising program will help them increase sales.

#### *LOCAL YOUTH*

DO NOT DISTRIBUTE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**                                                                    3

The need for fundraising is drastically increasing. Schools' athletic and activity programs are raising more money each year to pay for items that their budgets will not pay for. Athletic budgets are being cut and only pay for the basics. The how to fundraise is the problem and providing quality ways to raise funds is in high demand.

### COLLEGE/UNIVERSITY

RahRah will work directly with local colleges, universities, student athletics and organizations to help them raise money. Working directly with athletic administrators, boosters, coaches, alumni, NIL Collectives and students on campus to promote the RahRah Fundraising program.

### CORPORATE SALES

RahRah will provide larger scale corporations to participate in the customer and client loyalty program. This allows corporations to purchase RahRah memberships for employees and clients all while providing local, statewide value and giving back to urban and inner city schools.

### MERCHANT SERVICES PROGRAM(PAID)

RahRah will provide custom merchant service products and platforms to help support small businesses market themselves to the RahRah membership community. Paid services include: NIL Sales Program, Digital Product Services, Digital Advertising.

**Solution**

### LOCAL BUSINESSES

For local businesses, RahRah will take the pressure off, create long term relationships, and provide better opportunities to reach customers. Our digital marketing product will provide so many options: Push notifications, daily deals, daily/monthly tracking, geo-fencing alerts, advertising. Local businesses get to celebrate in the successes of the youth organizations that are supported with the use of the offers they provide. It's a WIN WIN!

### LOCAL SCHOOLS AND YOUTH ORGANIZATIONS

RahRah will offer a solution, providing a complete fundraising ecosystem that will enhance the organizations we work with through a digital fundraising product and platform to meet their fundraising needs. Traditional product sales such as discount cards, food products and just donations is saturating the communities our youth participate in. RahRah combines a digital product through the RahRah mobile membership application, with e-commerce products

CONFIDENTIAL - DO NOT DISTRIBUTE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

through the RahRah! Store and advertisement opportunities for organizations though the platform for local small business owners.  Residual income opportunities versus constant sales and repeat sales along with deliveries of products will be replaced through the RahRah! Fundraising program.

### COLLEGES/UNIVERSITIES

RahRah will provide income opportunities for athletic programs, NIL endorsed athletes and students through the RahRah custom sales program for Colleges/Universities.

### CORPORATE INSTITUTIONS

Corporate companies in local communities will be able to offer a employee or client loyalty program by partnering with RahRah all while giving back to the local urban and inner city youth.

### Market

There are 3 main components that make up the RahRah community:

1. The local business 2.  The local school, college or youth organization 3.  The supporters of both the business and youth community.

A potential RahRah member consists of supporters of each individual participant of an organization.   Participants will create a personal profile using AI technology to contact a list of supporters that can be promoted to nationwide and used at over 400,000 locations, by email, SMS, social media and QR code for face to face interaction.

We project an average of 10 members per student participant involved in the fundraiser for each organization.

Working an all community model, high schools, college/university, secondary schools and youth community organizations. Our market share expectations per metro market are a 10% projection to become RahRah members.  RahRah members can join their organization from any destination across the country.

CONFIDENTIAL - DO NOT DISTRIBUTE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**                                                                          5

## Market Growth

About 60 million children and teens from age 6 to 18 participate in organized sports          YOUTH SPORTS
each year. Of those, about 27 percent are involved in only one sport, according to the          PARTICIPATION
National Council of Youth Sports. Increasingly, they're training or competing year-             ARTICLE
round, often on multiple teams. Kids as young as 7 years old may join travel leagues in         REFERENCE
addition to school-sponsored programs.

RahRah's market penetration growth expectation is to grab 10% of the 60 million youth sports participants market.  6,000,000 youth sports athletes participating with RahRah, generating residual income opportunities for their organizations.

The youth sports average amount of money raised each year in the US is in the billions each year selling products.

This article below references estimated costs for many of these organizations.  The need for fundraising is actually growing, it's the how and the options to perform fundraising at these organizations is the problem.  RahRah provides a new and innovative fundraising product and solution that does not require constant selling.

Youth Sports Average Costs

CONFIDENTIAL - DO NOT DISSEMINATE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

## Competition

**There are over 10 million printed discounted cards sold annually each year in the US at an average retail price of around $20 with various schools and youth organizations. These cards and books are re-sold each season with an 1 year expiration date. Converting those over to annual paid RahRah members at an average retail price of $42 that will auto renew each year, is our competitive advantage.**

The competition in the youth fundraising space is a bunch of individual territory owners with no structure selling discount cards, cookie dough, popcorn and other novelty products. All of these individuals may share a brand name but operate separately. Some of these competitors have dabbled into mobile app platforms but only to sell the same traditional products that have to be sold and delivered each and every year.

Donation only platforms, provide organizations with a platform to collect payments and give nothing to the end supporter in return. These platforms are creating pain in the overall youth market and supporters and schools are getting exhausted with the constant ask for money by these companies without getting anything of value in return.

RahRah! will be a name brand and national sales force that will provide a high quality sales platform replacing the need for constant door knocking and product deliveries, combined with an awesome product and renewable sales model that will keep organizations funded all year versus just one time each season.

## Intellectual Property

RahRah has a registered trademark and has applied for a provisional patent .

## Partners & Resources

RahRah has applied for and is in the queue for the 2024 Comcast NBCSports Tech accelerator program.

Our application was accepted, and we have completed the initial interview process.

RahRah is now looking forward to connecting with possible partnership presentations to the many current partners of Comcast NBC Sports Tech. These partner matchups will occur in the month of Sept/October with the accelerator launch in Q1 of 2024.

CONFIDENTIAL - DO NOT DISSEMINATE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**                                                                          7

Such potential partners consist of various partners. NBC Sports, SportsEngine, NBCSports Athlete Direct, NBC Golf, Comcast Spectacor and more.

**Exit Strategy**

RahRah

Our goal for the next 3–5 years is to expand into multiple metro markets. During that time looking into collaborating with companies for an M & A exit strategy with a current sports tech company with greater resources for growth.  National companies like Comcast NBC Sports Next, Dick's Sporting Goods' Gamechanger, and Hudl are companies on our radar for an early exit strategy.

# Expectations

**Forecast**

How does RahRah currently bring in revenue?

1.  Memberships sold

2.  Membership renewals

3.  Additional donations


Additional Revenue Share Models:

RahRah Shopify Store – Fall 2024

RahRah Cashback Travel – Fall 2024

RahRah Donations – Jan 2025

RahRah Digital Advertisement Program – Late Fall/Winter 2024/Spring 2025

RahRah NIL Program – Late Fall/Winter 2024/Spring 2025

RahRah Digtial Merchant Services Program – Late Fall/Winter 2024/Spring 2025

RahRah Territory Licensing Agreements – Late Fall/Winter 2024/Spring 2025

CONFIDENTIAL – DO NOT DISTRIBUTE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**

RahRah has 4 year projection goal of 1,000,000 paid RahRah members with an average of $42 retail per member and a sales presence in a minimum of 50 metro areas.

Other benchmarks:

Customer Retention Rate  – 75%

Net Profit Margin – 30%

**Financial Highlights by Year**



CONFIDENTIAL - DO NOT DISSEMINATE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**

9

---

**Financing Needed**

In order for RahRah to scale and grow into other markets, funding will be a vital part of our growth to accelerate. Creating a new and improved product and have an outside sales force into our communities.

We are looking to raise 2million in equity.

CONFIDENTIAL – DO NOT DISSEMINATE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

# Execution

## Marketing & Sales

### Marketing Plan

RahRah will invest in relationship building with local small businesses, school administrators, coaches  and booster club organizers of community groups through a direct independent contractor sales force.

Working relationships within the community such as partnerships in each state like coaches and athletic director associations, PTO groups, chamber of commerce will be also ways of networking relationships.

Social media presence with our marketing team and sales force will also be a priority.

### Sales Plan

In each assigned territory, RahRah will have sales leaders, who will have different sales roles and requirements.

### *MERCHANT SALES TEAM*

Local merchant sales reps will be responsible for working directly with local small businesses to build long term relationships through a FREE digital discount marketing to participate in the mobile deals section of the RahRah app.  These sales reps will also provide area and statewide businesses, with opportunities through the RahRah paid merchant service program, paid local/statewide digital marketing adverting, and paid local/regional/nationwide NIL program for the fundraising groups in their areas.

### *SCHOOL/YOUTH SALES REPS*

Each RahRah territory will have a sales representative/representatives responsible for building and networking directly with the all schools and youth organizations within their designated sale territory to organize and perform the fundraisers within those assigned areas.

### COLLEGE/UNIVERSITY FUNDRAISING SALES

CONFIDENTIAL - DO NOT DISSEMINATE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

Each RahRah territory will have a sales representative/representatives responsible for building and networking directly with the all Colleges/Universities within their territory to organize and perform the fundraisers within those assigned areas, implementing the RahRah NIL and Student Sales Force Program.

### RahRah CORPORATE SALES

Each RahRah territory will have a local sales presentative who is responsible for working with larger corporations promoting the RahRah Corporate Sales Fundraising program for local urban/inner city communities.

### *RahRah Sales Rep Licensing Agreements Growth Plan*

We are developing a business opportunity model after 2024 that would provide these sales reps exclusive sales territory opportunities.  RahRah would recruit, train and manage each sales rep, who would pay a one time $100,000 fee to qualify and maintain certain quotas to remain eligible for licensing agreements.

# Operations

### Locations & Facilities

RahRah will have a home office location in Minneapolis, Minnesota that will house the leadership, administrative and national sales team.

### Technology

RahRah will be able to use digital devices for all sales reps to perform duties for signing agreements, onboarding and communication.  We will not have to rely on print for our sales force.  Email marketing, CRM platforms for our sales reps will be accessible tools.

We use JustiFi for payment processing a local Minneapolis company, AWS, Quickbooks, Heroku, Flutter, Digital Ocean.

Rebuilding our front and back end systems, combined with our mobile application through a relaunch of the product in Fall 2024 with RahRah 2.0.

CONFIDENTIAL – DO NOT DISSEMINATE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**                                                                                                    12

Our tech partner, Tarmac has worked with various companies and built applications for Caribou Coffee, Allina Health, Boston Scientific, Pentair.

**Equipment & Tools**

Laptop computers for our office team, printers, cell phones, etc.

CONFIDENTIAL – DO NOT DISTRIBUTE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**

# Milestones & Metrics

## Milestones Table

| Milestone | Due Date | Who's Responsible | Details |
|---|---|---|---|
| Merchant Sales Team | October 02, 2023 | Merchant Sales Team | Merchant sales team will start signing local advertisers for the RahRah digital marketing program for 2023 organizations |
| Youth Organization and Local Business Signing Season Kickoff | October 02, 2023 | Fundraising Team and Merchant Sales Team | Merchant Sales Team Hiring and training for Minneapolis/St Paul, Chicago

Fundraising Sales Team Hiring and training for Minneapolis/St Paul, Chicago |
| RahRah 2024 Pre-Launch | April 01, 2024 | RahRah Fundraising Team | RahRah fundraisers launched with organizations in the Minneapolis/St Paul, Chicago Markets:

Schools

Colleges/Universities

Community Youth Organizations |

CONFIDENTIAL – DO NOT DISSEMINATE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!** 14

| | | | |
|---|---|---|---|
| 2025 Growth Expansion Hiring | May 01, 2024 | CEO/Recruiting Team | Hiring merchant and fundraising sales team for new markets: |
| | | | Chicago |
| | | | Dallas/Fort Worth |
| | | | Houston |
| | | | Austin |
| | | | San Antonio |
| | | | Waco |
| RahRah Version 2.0 | July 15, 2024 | Merchant Sales Team and Sales Fundraising Team | All New Fundraisers will start kicking off with Version 2.0 of the RahRah fundraising platform. |
| RahRah Merchant Services Program Launch | January 01, 2025 | Merchant Sales Team | Merchant Sales team will launch premium paid RahRah Merchant Services Program including the following product options: |
| | | | RahRah NIL Sales Program - Name, Image, Likeness |
| | | | Digital Marketing Program |
| | | | Digital Marketing Advertising |

CONFIDENTIAL – DO NOT DISSEMINATE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**                                                                           **15**

**Key metrics**

In year 2024 our key metric is to create an expectation for how many RahRah members we average per each individual participant of each individual fundraising group. Also, what is our average number of RahRah members acquired per each individual fundraising organization. This will help us identify what is working, what we can do to improve and increase those averages.

In year 2025 our key metric will be the same for new territories, but will also shift to monitoring customer retention, specifically renewals of RahRah members. Our renewal program is set up as an auto-renewal. What is our churn rate? Our goal is 75% customer retention, are we hitting that goal? How is our customer retention CRM program performing?

Key Performance Indicators:

Community Youth – High Schools, Elementary and Middle Schools, Youth Sports Organizations

Students and Student Athletes at all youth levels

College student athletes

Local, regional, statewide and nationwide small businesses

Supporters of all KPI's in their local communities

CONFIDENTIAL – DO NOT DISSEMINATE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

# Company

## Overview

**Ownership & Structure/Capitalization Table**

RahRah Cap Table Link

**RahRah!**

TRI State Solutions, LLC dba RahRah is currently registered in the state of MN

David Nelson – Founder + CEO

Emily Nelson – Co-Founder and Director of Administration

There are no outside investors that have contributed to the funding of RahRah!

**Company history**

RahRah was founded in 2019 with the initial application development.  We ran a BETA test in the fall of 2019.

Due to Covid, RahRah was implemented in the fall of 2020.  The platform was promoted to members via zoom calls and direct links that were emailed and texted to supporters.  We had no profile or sales platform setup during this time

2021 was used as a combination of selling RahRah along with existing current traditional products simultaneously.

CONFIDENTIAL – DO NOT DISSEMINATE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

2022 was designed to start development of the new sales platform with re-design and new features that will provide the participants with a better system and solution to promote supporters to join RahRah!  The new platform will be completed and launched for new sales distribution with schools for the fall 2024 selling season.

# Team

## Organization Chart

David Nelson - Founder/CEO

https://www.linkedin.com/in/david-nelson-309009bb/

Nathan McKinley - COO

https://www.linkedin.com/in/nathan-mckinley-611358281/

Matt Dahlien - Fractional CMO

https://www.linkedin.com/in/matt-dahlien-5310112/

Tech Team - Tarmac

https://www.linkedin.com/company/tarmac-io/

Anthony Schmidt - Founder - Tarmac

https://www.linkedin.com/in/anthony-schmidt-38b271a/

## Advisors

David Nelson, founder and CEO specializes in sales, and has done a lot of the business planning by networking.  He resourced with BETA MN and specifically Cihan Behlivan, who has helped

CONFIDENTIAL - DO NOT DISSEMINATE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**                                                                                          18

tremendously with mentoring.  David also participated in TCSW 2022 and applied and was accepted into the BETA Backers program and made connections within those programs as well.

Brady Lipp, Great Point Capital

Aneela Idnani Kumar and Sameer Kumar of HabitAware in Minneapolis have been advisors/mentors as well.

CONFIDENTIAL – DO NOT DISSEMINATE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**

# Financial Plan

## Forecast

In year 2024. Our projection is to average 10 RahRah members per individual participant with an average retail sales amount of $42 per member and each subsequent renewal. 50% Gross profit per membership transaction and a 5% Service Fee per membership transaction.

In year 2025, our goal is to retain 75% of current RahRah members from 2024.

**our projection forecast in our financials reflects a 50% customer retention rate**

Adding other revenue models other than membership revenue to increase net profits with a goal of >30% net profit margin for the company. Additional Revenue Strategies: Merchant Services Program, Digital Marketing Ad Sales, NIL Revenue Program, E-Commerce Revenue Program.

Scaling in other metro markets by recruiting RahRah Territory Licensing Agreements with exclusive sales reps in those markets. Paying a one time fee of $100,000 per territory.

CONFIDENTIAL - DO NOT DISTRIBUTE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**

## Revenue by Month



## Expenses by Month



▨ **Direct Costs**   ▨ **Expenses**

CONFIDENTIAL – DO NOT DISSEMINATE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**

## Net Profit (or Loss) by Year



CONFIDENTIAL - DO NOT DISTRIBUTE  This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author

**RahRah!**                                                                                         22

# Statements

## Projected Profit and Loss

|  | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|
| **Revenue** | $339,990 | $10,095,754 | $23,498,962 | $37,545,113 | $45,577,698 |
| **Direct Costs** | | | | | |
| Gross Margin | $339,990 | $10,095,754 | $23,498,962 | $37,545,113 | $45,577,698 |
| **Gross Margin %** | **100%** | **100%** | **100%** | **100%** | **100%** |
| **Operating Expenses** | | | | | |
| Salaries & Wages | $58,752 | $276,332 | $403,792 | $427,072 | $459,880 |
| Employee Related Expenses | $11,750 | $52,866 | $73,558 | $74,614 | $75,776 |
| MSP - RahRah Memberships - Organization Commissions | | $2,077,700 | $4,513,758 | $7,271,336 | $8,928,348 |
| MSP - High School -Extra Donations - OGANIZATION Commissions | | $733,770 | $979,817 | $1,224,748 | $979,817 |
| MSP - RahRah Memberships - Rep Commissions | | $415,540 | $902,752 | $1,454,267 | $1,785,670 |
| Chicago Metro - RahRah Memberships - Organization Commissions | | $1,885,708 | $5,374,269 | $8,911,943 | $11,346,568 |
| Chicago Metro - High Schools - Extra Donations - Student Commission | | $672,390 | $1,344,842 | $1,530,842 | $1,344,842 |

This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!** 23

| | | | | |
|---|---|---|---|---|
| Chicago Metro - RahRah - Rep Commissions | | $377,142 | $1,074,854 | $1,782,389 | $4,538,627 |
| 2023 MEMBERSHIP RENEWALS REP COMMISSIONS | $105,000 | $105,000 | $105,000 | $105,000 | $105,000 |
| Smith / Schafer - Fractional CFO Service | $1,350 | $5,400 | $5,400 | $5,400 | $5,400 |
| Accounts Payable | | $9,000 | $18,000 | $18,000 | $18,000 |
| Office Space | | | $12,000 | $20,000 | $40,000 |
| Development- Tarmac | $231,400 | $351,200 | $150,000 | $200,000 | $200,000 |
| AWS | $5,000 | $28,000 | $180,000 | $300,000 | $400,000 |
| Training Meetings | | $6,000 | $10,000 | $20,000 | $40,000 |
| Chargebee(Customer Retention) | | $1,900 | $75,000 | $150,000 | $300,000 |
| Travel | | $4,800 | $20,000 | $40,000 | $80,000 |
| Annual Security Audit | | $12,500 | $15,000 | $15,000 | $15,000 |
| Software Costs | $1,350 | $6,000 | $12,000 | $30,000 | $50,000 |
| Business Insurance | $4,500 | $12,000 | $24,000 | $100,000 | $200,000 |
| Access Development | | $18,000 | $36,000 | $36,000 | $36,000 |
| Legal - Taft Law | $3,750 | $15,000 | $15,000 | $15,000 | $15,000 |
| Stripe | | $298,373 | $704,969 | $1,126,353 | $1,367,331 |
| Payroll | $100 | $200 | $6,000 | $12,000 | $24,000 |
| Customer Service Rep | | $52,500 | $90,000 | $120,000 | $120,000 |
| **Total Operating Expenses** | **$422,952** | **$7,417,322** | **$16,146,011** | **$24,989,964** | **$32,475,259** |

CONFIDENTIAL – DO NOT DISTRIBUTE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**

| | | | | | |
|---|---|---|---|---|---|
| **Operating Income** | ($82,962) | $2,678,432 | $7,352,951 | $12,555,149 | $13,102,439 |
| Interest Incurred | | | | | |
| Depreciation and Amortization | | | | | |
| Gain or Loss from Sale of Assets | | | | | |
| Income Taxes | $0 | $519,094 | $1,470,590 | $2,511,030 | $2,620,488 |
| **Total Expenses** | $422,952 | $7,936,416 | $17,616,601 | $27,500,994 | $35,095,747 |
| **Net Profit** | ($82,962) | $2,159,338 | $5,882,361 | $10,044,119 | $10,481,951 |
| **Net Profit / Sales** | (24%) | 21% | 25% | 27% | 23% |

CONFIDENTIAL – DO NOT DISSEMINATE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**                                                                                      25

## Projected Balance Sheet

| | Starting Balances | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|---|
| Cash | | ($102,052) | $2,139,092 | $8,259,641 | $18,573,882 | $29,098,715 |
| Accounts Receivable | | $0 | $0 | $0 | $0 | $0 |
| Inventory | | | | | | |
| Other Current Assets | | | | | | |
| **Total Current Assets** | | **($102,052)** | **$2,139,092** | **$8,259,641** | **$18,573,882** | **$29,098,715** |
| Long-Term Assets | | | | | | |
| Accumulated Depreciation | | | | | | |
| **Total Long-Term Assets** | | | | | | |
| **Total Assets** | | **($102,052)** | **$2,139,092** | **$8,259,641** | **$18,573,882** | **$29,098,715** |
| Accounts Payable | | $0 | $0 | $0 | $0 | $0 |
| Income Taxes Payable | | ($19,090) | $62,716 | $300,905 | $571,026 | $613,908 |
| Sales Taxes Payable | | $0 | $0 | $0 | $0 | $0 |
| Short-Term Debt | | | | | | |
| Prepaid Revenue | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total Current Liabilities** | **$0** | **($19,090)** | **$62,716** | **$300,905** | **$571,026** | **$613,908** |
| Long-Term Debt | | | | | | |
| **Long-Term Liabilities** | | | | | | |
| **Total Liabilities** | **$0** | **($19,090)** | **$62,716** | **$300,905** | **$571,026** | **$613,908** |

CONFIDENTIAL – DO NOT DISSEMINATE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**                                                                                              26

| | | | | | | |
|---|---|---|---|---|---|---|
| Paid-In Capital | | | | | | |
| Retained Earnings | $0 | $0 | ($82,962) | $2,076,376 | $7,958,736 | $18,002,856 |
| Earnings | | ($82,962) | $2,159,338 | $5,882,361 | $10,044,119 | $10,481,951 |
| **Total Owner's Equity** | **$0** | **($82,962)** | **$2,076,376** | **$7,958,736** | **$18,002,856** | **$28,484,807** |
| **Total Liabilities & Equity** | **$0** | **($102,052)** | **$2,139,092** | **$8,259,641** | **$18,573,882** | **$29,098,715** |

CONFIDENTIAL - DO NOT DISSEMINATE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**

## Projected Cash Flow Statement

| | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|
| **Net Cash Flow from Operations** | | | | | |
| Net Profit | ($82,962) | $2,159,338 | $5,882,361 | $10,044,119 | $10,481,951 |
| Depreciation & Amortization | | | | | |
| Change in Accounts Receivable | $0 | $0 | $0 | $0 | $0 |
| Change in Inventory | | | | | |
| Change in Accounts Payable | $0 | $0 | $0 | $0 | $0 |
| Change in Income Tax Payable | ($19,090) | $81,806 | $238,189 | $270,121 | $42,882 |
| Change in Sales Tax Payable | $0 | $0 | $0 | $0 | $0 |
| Change in Prepaid Revenue | $0 | $0 | $0 | $0 | $0 |
| **Net Cash Flow from Operations** | **($102,052)** | **$2,241,144** | **$6,120,550** | **$10,314,240** | **$10,524,833** |
| **Investing & Financing** | | | | | |
| Assets Purchased or Sold | | | | | |
| **Net Cash from Investing** | | | | | |
| Investments Received | | | | | |
| Dividends & Distributions | | | | | |

CONFIDENTIAL – DO NOT DISSEMINATE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**

| | | | | | |
|---|---|---|---|---|---|
| Change in Short-Term Debt | | | | | |
| Change in Long-Term Debt | | | | | |
| **Net Cash from Financing** | | | | | |
| Cash at Beginning of Period | $0 | ($102,052) | $2,139,092 | $8,259,641 | $18,573,882 |
| Net Change in Cash | ($102,052) | $2,241,144 | $6,120,550 | $10,314,240 | $10,524,833 |
| **Cash at End of Period** | **($102,052)** | **$2,139,092** | **$8,259,641** | **$18,573,882** | **$29,098,715** |

**RahRah MVP Pilot Launch – 3 Year Profit & Loss 2020–2022**

2020 RahRah MVP Pilot P & L

2021 RahRah MVP Pilot P & L

2022 RahRah MVP Pilot P & L

# Business Filings

## Articles Of Organization – MN Sec Of State

RahRah MN Sec Of State Articles Of Organization

## Certification Of Record – MN Sec Of State

Tri-State Solutions, LLC dba RahRah MN Sec Of State Certification Of Record

CONFIDENTIAL – DO NOT DISTRIBUTE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**

**Investor Agreement – Great Point Capital**

Great Point Capital Investor Engagement Agreement

For over twenty years, Great Point Capital has been providing independent, holistic wealth management, investment banking and capital market services. Founded and staffed by professional traders, bankers and experienced wealth managers. Great Point delivers the unique combination of local, customized services with a national brand and deep resources.

RahRah is working with Brady Lipp an investment banker from Great Point Capital who lives in Minneapolis. Brady has connected David Nelson, RahRah's Founder/CEO with individuals who are interested in investment opportunities with RahRah.

CONFIDENTIAL – DO NOT DISSEMINATE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author

**RahRah!**

30

# Appendix

## Profit and Loss Statement (With Monthly Detail)

| 2023 | Jan '23 | Feb '23 | Mar '23 | Apr '23 | May '23 | June '23 | July '23 | Aug '23 | Sept '23 | Oct '23 | Nov '23 | Dec '23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | |
| MSP High School - RahRah Memberships | | | | | | | | $39,990 | | | | |
| MSP High School - RahRah Membership Service Fee | | | | | | | | | | | | |
| MSP High School - Extra Donations | | | | | | | | | | | | |
| MSP High School - Extra Donations - Service Fee | | | | | | | | | | | | |
| Chicago Metro High School - RahRah Memberships | | | | | | | | | | | | |
| Chicago Metro High School - RahRah Membership Service Fee | | | | | | | | | | | | |
| Chicago Metro High School Extra Donations | | | | | | | | | | | | |

**CONFIDENTIAL – DO NOT DISSEMINATE.** This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**                                                                                                        31

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Chicago Metro High School - Extra Donations - Service Fee | | | | | | | | | | | |
| Projected 2023 Renewal Revenue 01/01/23 - 12/31/23 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| **Total Revenue** | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $64,990 | $25,000 | $25,000 | $25,000 |
| **Total Direct Costs** | | | | | | | | | | | |
| Gross Margin | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $64,990 | $25,000 | $25,000 | $25,000 |
| **Gross Margin %** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **Operating Expenses** | | | | | | | | | | | |
| Salaries and Wages | | | | | | | | | | | |
| CEO / PRESIDENT OF SALES (0.85) | | | | | | | | | $14,584 | $14,584 | $14,584 |
| COO / Tech Project Manager (0.85) | | | | | | | | | $5,000 | $5,000 | $5,000 |
| Administrative Lead (0.67) | | | | | | | | | | | |
| Customer Service (0.7) | | | | | | | | | | | |
| Recruiter (0.63) | | | | | | | | | | | |
| Total Salaries & Wages | | | | | | | | | $19,584 | $19,584 | $19,584 |

**CONFIDENTIAL – DO NOT DISSEMINATE.** This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**

32

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Employee Related Expenses | | | | | | | | | | $3,917 | $3,917 | $3,917 |
| MSP - RahRah Memberships - Organization Commissions | | | | | | | | | | | | |
| MSP - High School -Extra Donations - OGANIZATION Commissions | | | | | | | | | | | | |
| MSP - RahRah Memberships - Rep Commissions | | | | | | | | | | | | |
| Chicago Metro - RahRah Memberships - Organization Commissions | | | | | | | | | | | | |
| Chicago Metro - High Schools - Extra Donations - Student Commission | | | | | | | | | | | | |
| Chicago Metro - RahRah - Rep Commissions | | | | | | | | | | | | |
| 2023 MEMBERSHIP RENEWALS REP COMMISSIONS | $8,750 | $8,750 | $8,750 | $8,750 | $8,750 | $8,750 | $8,750 | $8,750 | $8,750 | $8,750 | $8,750 | $8,750 |
| Smith / Schafer - Fractional CFO Service | | | | | | | | | | $450 | $450 | $450 |
| Accounts Payable | | | | | | | | | | | | |
| Office Space | | | | | | | | | | | | |
| Development- Tarmac | | | | | | | | $55,800 | $43,900 | $43,900 | $43,900 | $43,900 |

**CONFIDENTIAL – DO NOT DISSEMINATE.** This business plan contains confidential, trade–secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

# RahRah!

33

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AWS | | | | | | | | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 |
| Training Meetings | | | | | | | | | | | | |
| Chargebee(Customer Retention) | | | | | | | | | | | | |
| Travel | | | | | | | | | | | | |
| Annual Security Audit | | | | | | | | | | | | |
| Software Costs | | | | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 |
| Business Insurance | | | | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 |
| Access Development | | | | | | | | | | | | |
| Legal - Taft Law | | | | | | | | | | $1,250 | $1,250 | $1,250 |
| Stripe | | | | | | | | | | | | |
| Payroll | | | | $100 | | | | | | | | |
| Customer Service Rep | | | | | | | | | | | | |
| Total Operating Expenses | $8,750 | $8,750 | $8,750 | $9,500 | $9,400 | $9,400 | $9,400 | $66,200 | $54,300 | $79,501 | $79,501 | $79,501 |
| Operating Income | $16,250 | $16,250 | $16,250 | $15,500 | $15,600 | $15,600 | $15,600 | ($1,210) | ($29,300) | ($54,501) | ($54,501) | ($54,501) |
| Interest Incurred | | | | | | | | | | | | |
| Depreciation and Amortization | | | | | | | | | | | | |
| Gain or Loss from Sale of Assets | | | | | | | | | | | | |
| Income Taxes | $3,250 | $3,250 | $3,250 | $3,100 | $3,120 | $3,120 | $3,120 | ($242) | ($5,860) | ($10,900) | ($5,208) | $0 |
| Total Expenses | $12,000 | $12,000 | $12,000 | $12,600 | $12,520 | $12,520 | $12,520 | $65,958 | $48,440 | $68,501 | $74,293 | $79,501 |

CONFIDENTIAL – DO NOT DISSEMINATE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**

| Net Profit | $13,000 | $13,000 | $13,000 | $12,400 | $12,480 | $12,480 | $12,480 | ($968) | ($23,440) | ($43,601) | ($49,293) | ($54,501) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Profit / Sales | 52% | 52% | 52% | 50% | 50% | 50% | 50% | (1%) | (94%) | (174%) | (197%) | (218%) |

**CONFIDENTIAL – DO NOT DISSEMINATE.** This business plan contains confidential, trade–secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**                                                                                      35

| 2024 | Jan '24 | Feb '24 | Mar '24 | Apr '24 | May '24 | June '24 | July '24 | Aug '24 | Sept '24 | Oct '24 | Nov '24 | Dec '24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | |
| MSP High School - RahRah Memberships | | | | | | | | $3,039,240 | $446,488 | $223,224 | $223,224 | $223,224 |
| MSP High School - RahRah Membership Service Fee | | | | | | | | $149,250 | $22,218 | $11,108 | $11,108 | $11,108 |
| MSP High School - Extra Donations | | | | | | | | $534,750 | $79,608 | $39,804 | $39,804 | $39,804 |
| MSP High School - Extra Donations - Service Fee | | | | | | | | $26,738 | $3,980 | $1,990 | $1,990 | $1,990 |
| Chicago Metro High School - RahRah Memberships | | | | | | | | $2,999,250 | $399,900 | $124,089 | $124,089 | $124,089 |
| Chicago Metro High School - RahRah Membership Service Fee | | | | | | | | $149,250 | $19,900 | $6,175 | $6,175 | $6,175 |
| Chicago Metro High School Extra Donations | | | | | | | | $534,750 | $34,410 | $34,410 | $34,410 | $34,410 |
| Chicago Metro High School - Extra Donations - Service Fee | | | | | | | | $26,738 | $1,721 | $1,721 | $1,721 | $1,721 |
| Projected 2023 Renewal Revenue 01/01/23 - 12/31/23 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| **Total Revenue** | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $7,484,965 | $1,033,226 | $467,521 | $467,521 | $467,521 |

**CONFIDENTIAL – DO NOT DISSEMINATE.** This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Direct Costs** | | | | | | | | | | | |
| Gross Margin | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $7,484,965 | $1,033,226 | $467,521 | $467,521 | $467,521 |
| **Gross Margin %** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **Operating Expenses** | | | | | | | | | | | |
| Salaries and Wages | | | | | | | | | | | |
| CEO / PRESIDENT OF SALES (0.85) | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,584 | $14,584 | $14,584 | $14,584 |
| COO / Tech Project Manager (0.85) | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 |
| Administrative Lead (0.67) | | | | | | | | | $4,000 | $4,000 | $4,000 | $4,000 |
| Customer Service (0.7) | | | | | | | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 |
| Recruiter (0.63) | | | | | | | | | | | $6,666 | $6,666 |
| Total Salaries & Wages | $19,583 | $19,583 | $19,583 | $19,583 | $19,583 | $19,583 | $21,583 | $21,583 | $25,584 | $25,584 | $32,250 | $32,250 |
| Employee Related Expenses | $3,917 | $3,917 | $3,917 | $3,917 | $3,917 | $3,917 | $3,917 | $3,917 | $4,717 | $4,717 | $6,050 | $6,050 |
| MSP - RahRah Memberships - Organization Commissions | | | | | | | | $1,519,620 | $223,244 | $111,612 | $111,612 | $111,612 |
| MSP - High School -Extra Donations - OGANIZATION Commissions | | | | | | | | $534,750 | $79,608 | $39,804 | $39,804 | $39,804 |

**CONFIDENTIAL – DO NOT DISSEMINATE.** This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**

37

| | C1 | C2 | C3 | C4 | C5 | C6 | C7 | C8 | C9 | C10 | C11 | C12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MSP - RahRah Memberships - Rep Commissions | | | | | | | | $303,924 | $44,649 | $22,322 | $22,322 | $22,322 |
| Chicago Metro - RahRah Memberships - Organization Commissions | | | | | | | | $1,499,625 | $199,950 | $62,044 | $62,044 | $62,044 |
| Chicago Metro - High Schools - Extra Donations - Student Commission | | | | | | | | $534,750 | $34,410 | $34,410 | $34,410 | $34,410 |
| Chicago Metro - RahRah - Rep Commissions | | | | | | | | $299,925 | $39,990 | $12,409 | $12,409 | $12,409 |
| 2023 MEMBERSHIP RENEWALS REP COMMISSIONS | $8,750 | $8,750 | $8,750 | $8,750 | $8,750 | $8,750 | $8,750 | $8,750 | $8,750 | $8,750 | $8,750 | $8,750 |
| Smith / Schafer - Fractional CFO Service | $450 | $450 | $450 | $450 | $450 | $450 | $450 | $450 | $450 | $450 | $450 | $450 |
| Accounts Payable | | | | | | | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 |
| Office Space | | | | | | | | | | | | |
| Development - Tarmac | $43,900 | $43,900 | $43,900 | $43,900 | $43,900 | $43,900 | $43,900 | $43,900 | | | | |
| AWS | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $2,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 |
| Training Meetings | | | $1,000 | | | $1,000 | | | $2,000 | $2,000 | | |
| Chargeback(Customer Retention) | | | | | | | | $200 | $300 | $400 | $500 | $500 |
| Travel | $400 | $400 | $400 | $400 | $400 | $400 | $400 | $400 | $400 | $400 | $400 | $400 |
| Annual Security Audit | | | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 |
| Software Costs | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 |

**CONFIDENTIAL – DO NOT DISSEMINATE.** This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

# RahRah!

38

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Business Insurance | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 |
| Access Development | | | | | | | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 |
| Legal - Taft Law | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 |
| Stripe | | | | | | | $750 | $224,549 | $30,997 | $14,026 | $14,026 | $14,026 |
| Payroll | | | | $200 | | | | | | | | |
| Customer Service Rep | | | | | | | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 |
| Total Operating Expenses | $80,750 | $80,750 | $83,000 | $82,200 | $82,000 | $90,500 | $97,750 | $5,016,343 | $715,049 | $358,928 | $365,028 | $365,028 |
| Operating Income | ($55,750) | ($55,750) | ($58,000) | ($57,200) | ($57,000) | ($65,500) | ($72,750) | $2,468,622 | $318,177 | $108,593 | $102,493 | $102,493 |
| Interest Incurred | | | | | | | | | | | | |
| Depreciation and Amortization | | | | | | | | | | | | |
| Gain or Loss from Sale of Assets | | | | | | | | | | | | |
| Income Taxes | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $392,743 | $63,635 | $21,719 | $20,498 | $20,499 |
| Total Expenses | $80,750 | $80,750 | $83,000 | $82,200 | $82,000 | $90,500 | $97,750 | $5,409,086 | $778,684 | $380,647 | $385,526 | $385,527 |
| Net Profit | ($55,750) | ($55,750) | ($58,000) | ($57,200) | ($57,000) | ($65,500) | ($72,750) | $2,075,879 | $254,542 | $86,874 | $81,995 | $81,994 |
| Net Profit / Sales | (223%) | (223%) | (232%) | (229%) | (228%) | (262%) | (291%) | 28% | 25% | 19% | 18% | 18% |

CONFIDENTIAL – DO NOT DISSEMINATE. This business plan contains confidential, trade–secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**

| | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|
| **Revenue** | | | | | |
| MSP High School - RahRah Memberships | $39,990 | $4,155,401 | $9,027,517 | $14,542,671 | $17,856,696 |
| MSP High School - RahRah Membership Service Fee | | $204,793 | $447,142 | $721,903 | $887,083 |
| MSP High School - Extra Donations | | $733,770 | $979,817 | $1,224,748 | $979,817 |
| MSP High School - Extra Donations - Service Fee | | $36,689 | $48,991 | $61,237 | $48,991 |
| Chicago Metro High School - RahRah Memberships | | $3,771,417 | $10,748,538 | $17,823,885 | $22,693,136 |
| Chicago Metro High School - RahRah Membership Service Fee | | $187,675 | $534,873 | $1,205,342 | $1,399,891 |
| Chicago Metro High School Extra Donations | | $672,390 | $1,344,842 | $1,530,842 | $1,344,842 |
| Chicago Metro High School - Extra Donations - Service Fee | | $33,620 | $67,242 | $134,484 | $67,242 |
| Projected 2023 Renewal Revenue 01/01/23 - 12/31/23 | $300,000 | $300,000 | $300,000 | $300,000 | $300,000 |
| **Total Revenue** | **$339,990** | **$10,095,754** | **$23,498,962** | **$37,545,113** | **$45,577,698** |
| **Total Direct Costs** | | | | | |
| Gross Margin | $339,990 | $10,095,754 | $23,498,962 | $37,545,113 | $45,577,698 |
| **Gross Margin %** | **100%** | **100%** | **100%** | **100%** | **100%** |
| **Operating Expenses** | | | | | |
| Salaries and Wages | | | | | |
| CEO / PRESIDENT OF SALES (0.85) | $43,752 | $175,000 | $175,000 | $175,000 | $175,000 |
| COO / Tech Project Manager (0.85) | $15,000 | $60,000 | $60,000 | $60,000 | $60,000 |
| Administrative Lead (0.67) | | $16,000 | $52,800 | $58,080 | $63,888 |
| Customer Service (0.7) | | $12,000 | $36,000 | $54,000 | $81,000 |
| Recruiter (0.63) | | $13,332 | $79,992 | $79,992 | $79,992 |
| Total Salaries & Wages | $58,752 | $276,332 | $403,792 | $427,072 | $459,880 |
| Employee Related Expenses | $11,750 | $52,866 | $73,558 | $74,614 | $75,776 |

**CONFIDENTIAL – DO NOT DISSEMINATE.** This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

# RahRah!

40

| | | | | |
|---|---|---|---|---|
| MSP - RahRah Memberships - Organization Commissions | | $2,077,700 | $4,513,758 | $7,271,336 | $8,928,348 |
| MSP - High School -Extra Donations - OGANIZATION Commissions | | $733,770 | $979,817 | $1,224,748 | $979,817 |
| MSP - RahRah Memberships - Rep Commissions | | $415,540 | $902,752 | $1,454,267 | $1,785,670 |
| Chicago Metro - RahRah Memberships - Organization Commissions | | $1,885,708 | $5,374,269 | $8,911,943 | $11,346,568 |
| Chicago Metro - High Schools - Extra Donations - Student Commission | | $672,390 | $1,344,842 | $1,530,842 | $1,344,842 |
| Chicago Metro - RahRah - Rep Commissions | | $377,142 | $1,074,854 | $1,782,389 | $4,538,627 |
| 2023 MEMBERSHIP RENEWALS REP COMMISSIONS | $105,000 | $105,000 | $105,000 | $105,000 | $105,000 |
| Smith / Schafer - Fractional CFO Service | $1,350 | $5,400 | $5,400 | $5,400 | $5,400 |
| Accounts Payable | | $9,000 | $18,000 | $18,000 | $18,000 |
| Office Space | | | $12,000 | $20,000 | $40,000 |
| Development- Tarmac | $231,400 | $351,200 | $150,000 | $200,000 | $200,000 |
| AWS | $5,000 | $28,000 | $180,000 | $300,000 | $400,000 |
| Training Meetings | | $6,000 | $10,000 | $20,000 | $40,000 |
| Chargebee(Customer Retention) | | $1,900 | $75,000 | $150,000 | $300,000 |
| Travel | | $4,800 | $20,000 | $40,000 | $80,000 |
| Annual Security Audit | | $12,500 | $15,000 | $15,000 | $15,000 |
| Software Costs | $1,350 | $6,000 | $12,000 | $30,000 | $50,000 |
| Business Insurance | $4,500 | $12,000 | $24,000 | $100,000 | $200,000 |
| Access Development | | $18,000 | $36,000 | $36,000 | $36,000 |
| Legal - Taft Law | $3,750 | $15,000 | $15,000 | $15,000 | $15,000 |
| Stripe | | $298,373 | $704,969 | $1,126,353 | $1,367,331 |
| Payroll | $100 | $200 | $6,000 | $12,000 | $24,000 |
| Customer Service Rep | | $52,500 | $90,000 | $120,000 | $120,000 |
| **Total Operating Expenses** | **$422,952** | **$7,417,322** | **$16,146,011** | **$24,989,964** | **$32,475,259** |

**CONFIDENTIAL – DO NOT DISSEMINATE.** This business plan contains confidential, trade–secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**

41

| Operating Income | ($82,962) | $2,678,432 | $7,352,951 | $12,555,149 | $13,102,439 |
|---|---|---|---|---|---|
| Interest Incurred | | | | | |
| Depreciation and Amortization | | | | | |
| Gain or Loss from Sale of Assets | | | | | |
| Income Taxes | $0 | $519,094 | $1,470,590 | $2,511,030 | $2,620,488 |
| **Total Expenses** | **$422,952** | **$7,936,416** | **$17,616,601** | **$27,500,994** | **$35,095,747** |
| **Net Profit** | **($82,962)** | **$2,159,338** | **$5,882,361** | **$10,044,119** | **$10,481,951** |
| **Net Profit / Sales** | **(24%)** | **21%** | **25%** | **27%** | **23%** |

**CONFIDENTIAL – DO NOT DISSEMINATE.** This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**

42

## Balance Sheet (With Monthly Detail)

| | Starting Balances | Jan '23 | Feb '23 | Mar '23 | Apr '23 | May '23 | June '23 | July '23 | Aug '23 | Sept '23 | Oct '23 | Nov '23 | Dec '23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash | | $16,250 | $32,500 | $48,750 | $54,500 | $70,100 | $85,700 | $91,960 | $90,750 | $61,450 | $6,949 | ($47,552) | ($102,052) |
| Accounts Receivable | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Inventory | | | | | | | | | | | | | |
| Other Current Assets | | | | | | | | | | | | | |
| **Total Current Assets** | | $16,250 | $32,500 | $48,750 | $54,500 | $70,100 | $85,700 | $91,960 | $90,750 | $61,450 | $6,949 | ($47,552) | ($102,052) |
| Long-Term Assets | | | | | | | | | | | | | |
| Accumulated Depreciation | | | | | | | | | | | | | |
| **Total Long-Term Assets** | | | | | | | | | | | | | |
| **Total Assets** | | $16,250 | $32,500 | $48,750 | $54,500 | $70,100 | $85,700 | $91,960 | $90,750 | $61,450 | $6,949 | ($47,552) | ($102,052) |
| Accounts Payable | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Income Taxes Payable | | $3,250 | $6,500 | $9,750 | $3,100 | $6,220 | $9,340 | $3,120 | $2,878 | ($2,982) | ($13,882) | ($19,090) | ($19,090) |
| Sales Taxes Payable | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Short-Term Debt | | | | | | | | | | | | | |
| Prepaid Revenue | $0 | | | | | | | | | $0 | $0 | $0 | $0 | $0 |
| **Total Current Liabilities** | $0 | $3,250 | $6,500 | $9,750 | $3,100 | $6,220 | $9,340 | $3,120 | $2,878 | ($2,982) | ($13,882) | ($19,090) | ($19,090) |

**CONFIDENTIAL – DO NOT DISSEMINATE.** This business plan contains confidential, trade–secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**

43

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Long-Term Debt | | | | | | | | | | | | | |
| Long-Term Liabilities | | | | | | | | | | | | | |
| Total Liabilities | $0 | $3,250 | $6,500 | $9,750 | $3,100 | $6,220 | $9,340 | $3,120 | $2,878 | ($2,982) | ($13,882) | ($19,090) | ($19,090) |
| Paid-In Capital | | | | | | | | | | | | | |
| Retained Earnings | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Earnings | | $13,000 | $26,000 | $39,000 | $51,400 | $63,880 | $76,360 | $88,840 | $87,872 | $64,432 | $20,831 | ($28,462) | ($82,962) |
| Total Owner's Equity | $0 | $13,000 | $26,000 | $39,000 | $51,400 | $63,880 | $76,360 | $88,840 | $87,872 | $64,432 | $20,831 | ($28,462) | ($82,962) |
| Total Liabilities & Equity | $0 | $16,250 | $32,500 | $48,750 | $54,500 | $70,100 | $85,700 | $91,960 | $90,750 | $61,450 | $6,949 | ($47,552) | ($102,052) |

**CONFIDENTIAL − DO NOT DISSEMINATE.** This business plan contains confidential, trade−secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**

44

| 2024 | Jan '24 | Feb '24 | Mar '24 | Apr '24 | May '24 | June '24 | July '24 | Aug '24 | Sept '24 | Oct '24 | Nov '24 | Dec '24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash | ($157,802) | ($213,552) | ($252,461) | ($309,661) | ($366,660) | ($432,160) | ($504,910) | $1,963,713 | $2,281,890 | $1,934,105 | $2,036,598 | $2,139,092 |
| Accounts Receivable | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Inventory | | | | | | | | | | | | |
| Other Current Assets | | | | | | | | | | | | |
| Total Current Assets | ($157,802) | ($213,552) | ($252,461) | ($309,661) | ($366,660) | ($432,160) | ($504,910) | $1,963,713 | $2,281,890 | $1,934,105 | $2,036,598 | $2,139,092 |
| Long-Term Assets | | | | | | | | | | | | |
| Accumulated Depreciation | | | | | | | | | | | | |
| Total Long-Term Assets | | | | | | | | | | | | |
| Total Assets | ($157,802) | ($213,552) | ($252,461) | ($309,661) | ($366,660) | ($432,160) | ($504,910) | $1,963,713 | $2,281,890 | $1,934,105 | $2,036,598 | $2,139,092 |
| Accounts Payable | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Income Taxes Payable | ($19,090) | ($19,090) | $0 | $0 | $0 | $0 | $0 | $392,743 | $456,378 | $21,719 | $42,217 | $62,716 |
| Sales Taxes Payable | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Short-Term Debt | | | | | | | | | | | | |
| Prepaid Revenue | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Current Liabilities | ($19,090) | ($19,090) | $0 | $0 | $0 | $0 | $0 | $392,743 | $456,378 | $21,719 | $42,217 | $62,716 |
| Long-Term Debt | | | | | | | | | | | | |
| Long-Term Liabilities | | | | | | | | | | | | |
| Total Liabilities | ($19,090) | ($19,090) | $0 | $0 | $0 | $0 | $0 | $392,743 | $456,378 | $21,719 | $42,217 | $62,716 |

CONFIDENTIAL – DO NOT DISSEMINATE. This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**                                                                                                                     45

Paid-In Capital

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Retained Earnings | ($82,962) | ($82,962) | ($82,962) | ($82,962) | ($82,962) | ($82,962) | ($82,962) | ($82,962) | ($82,962) | ($82,962) | ($82,962) |
| Earnings | ($55,750) | ($111,499) | ($169,499) | ($226,698) | ($283,698) | ($349,158) | ($421,947) | $1,653,932 | $1,908,474 | $1,995,348 | $2,077,343 | $2,159,338 |
| Total Owner's Equity | ($138,712) | ($194,462) | ($252,461) | ($309,661) | ($366,660) | ($432,160) | ($504,910) | $1,570,970 | $1,825,512 | $1,912,386 | $1,994,381 | $2,076,376 |
| Total Liabilities & Equity | ($157,802) | ($213,552) | ($252,461) | ($309,661) | ($366,660) | ($432,160) | ($504,910) | $1,963,713 | $2,281,890 | $1,934,105 | $2,036,598 | $2,139,092 |

**CONFIDENTIAL – DO NOT DISSEMINATE.** This business plan contains confidential, trade–secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**

46

| | Starting Balances | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|---|
| Cash | | ($102,052) | $2,139,092 | $8,259,641 | $18,573,882 | $29,098,715 |
| Accounts Receivable | | $0 | $0 | $0 | $0 | $0 |
| Inventory | | | | | | |
| Other Current Assets | | | | | | |
| **Total Current Assets** | | **($102,052)** | **$2,139,092** | **$8,259,641** | **$18,573,882** | **$29,098,715** |
| Long-Term Assets | | | | | | |
| Accumulated Depreciation | | | | | | |
| **Total Long-Term Assets** | | | | | | |
| **Total Assets** | | **($102,052)** | **$2,139,092** | **$8,259,641** | **$18,573,882** | **$29,098,715** |
| Accounts Payable | | $0 | $0 | $0 | $0 | $0 |
| Income Taxes Payable | | ($19,090) | $62,716 | $300,905 | $571,026 | $613,908 |
| Sales Taxes Payable | | $0 | $0 | $0 | $0 | $0 |
| Short-Term Debt | | | | | | |
| Prepaid Revenue | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total Current Liabilities** | **$0** | **($19,090)** | **$62,716** | **$300,905** | **$571,026** | **$613,908** |
| Long-Term Debt | | | | | | |
| **Long-Term Liabilities** | | | | | | |
| **Total Liabilities** | **$0** | **($19,090)** | **$62,716** | **$300,905** | **$571,026** | **$613,908** |
| Paid-in Capital | | | | | | |
| Retained Earnings | | $0 | ($82,962) | $2,076,376 | $7,958,736 | $18,002,856 |
| Earnings | | ($82,962) | $2,159,338 | $5,882,361 | $10,044,119 | $10,481,951 |
| **Total Owner's Equity** | **$0** | **($82,962)** | **$2,076,376** | **$7,958,736** | **$18,002,856** | **$28,484,807** |
| **Total Liabilities & Equity** | **$0** | **($102,052)** | **$2,139,092** | **$8,259,641** | **$18,573,882** | **$29,098,715** |

**CONFIDENTIAL – DO NOT DISSEMINATE.** This business plan contains confidential, trade–secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**                                                                                                          47

## Cash Flow Statement (With Monthly Detail)

| 2023 | Jan '23 | Feb '23 | Mar '23 | Apr '23 | May '23 | June '23 | July '23 | Aug '23 | Sept '23 | Oct '23 | Nov '23 | Dec '23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Net Cash Flow from Operations** | | | | | | | | | | | | |
| Net Profit | $13,000 | $13,000 | $13,000 | $12,400 | $12,480 | $12,480 | $12,480 | ($968) | ($23,440) | ($43,601) | ($49,293) | ($54,501) |
| Depreciation & Amortization | | | | | | | | | | | | |
| Change In Accounts Receivable | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Change In Inventory | | | | | | | | | | | | |
| Change In Accounts Payable | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Change In Income Tax Payable | $3,250 | $3,250 | $3,250 | ($6,650) | $3,120 | $3,120 | ($6,220) | ($242) | ($5,860) | ($10,900) | ($5,208) | $0 |
| Change In Sales Tax Payable | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Change In Prepaid Revenue | $0 | | | | | | | $0 | $0 | $0 | $0 | $0 |
| **Net Cash Flow from Operations** | **$16,250** | **$16,250** | **$16,250** | **$5,750** | **$15,600** | **$15,600** | **$6,260** | **($1,210)** | **($29,300)** | **($54,501)** | **($54,501)** | **($54,501)** |
| **Investing & Financing** | | | | | | | | | | | | |
| Assets Purchased or Sold | | | | | | | | | | | | |
| **Net Cash from Investing** | | | | | | | | | | | | |

**CONFIDENTIAL – DO NOT DISSEMINATE.** This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**  48

Investments
Received

Dividends &
Distributions

Change in
Short-Term
Debt

Change in
Long-Term
Debt

**Net Cash
from
Financing**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash at Beginning of Period** | $0 | $16,250 | $32,500 | $48,750 | $54,500 | $70,100 | $85,700 | $91,960 | $90,750 | $61,450 | $6,949 | ($47,552) |
| **Net Change in Cash** | $16,250 | $16,250 | $16,250 | $5,750 | $15,600 | $15,600 | $6,260 | ($1,210) | ($29,300) | ($54,501) | ($54,501) | ($54,501) |
| **Cash at End of Period** | $16,250 | $32,500 | $48,750 | $54,500 | $70,100 | $85,700 | $91,960 | $90,750 | $61,450 | $6,949 | ($47,552) | ($102,052) |

**CONFIDENTIAL – DO NOT DISSEMINATE.** This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**

| 2024 | Jan '24 | Feb '24 | Mar '24 | Apr '24 | May '24 | June '24 | July '24 | Aug '24 | Sept '24 | Oct '24 | Nov '24 | Dec '24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Net Cash Flow from Operations** | | | | | | | | | | | | |
| Net Profit | ($55,750) | ($55,750) | ($58,000) | ($57,200) | ($57,000) | ($65,500) | ($72,750) | $2,075,879 | $254,542 | $86,874 | $81,995 | $81,994 |
| Depreciation & Amortization | | | | | | | | | | | | |
| Change in Accounts Receivable | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Change in Inventory | | | | | | | | | | | | |
| Change in Accounts Payable | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Change in Income Tax Payable | $0 | $0 | $19,090 | $0 | $0 | $0 | $0 | $392,743 | $63,635 | ($434,659) | $20,498 | $20,499 |
| Change in Sales Tax Payable | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Change in Prepaid Revenue | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Net Cash Flow from Operations** | ($55,750) | ($55,750) | ($38,910) | ($57,200) | ($57,000) | ($65,500) | ($72,750) | $2,468,622 | $318,177 | ($347,785) | $102,493 | $102,493 |
| **Investing & Financing** | | | | | | | | | | | | |
| Assets Purchased or Sold | | | | | | | | | | | | |
| **Net Cash from Investing** | | | | | | | | | | | | |
| Investments Received | | | | | | | | | | | | |

**CONFIDENTIAL – DO NOT DISSEMINATE.** This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Dividends & Distributions | | | | | | | | | | | |
| Change in Short-Term Debt | | | | | | | | | | | |
| Change in Long-Term Debt | | | | | | | | | | | |
| **Net Cash from Financing** | | | | | | | | | | | |
| Cash at Beginning of Period | ($102,052) | ($157,802) | ($213,552) | ($252,461) | ($309,661) | ($366,660) | ($432,160) | ($504,910) | $1,963,713 | $2,281,890 | $1,934,105 | $2,036,598 |
| Net Change in Cash | ($55,750) | ($55,750) | ($38,910) | ($57,200) | ($57,000) | ($65,500) | ($72,750) | $2,468,622 | $318,177 | ($347,785) | $102,493 | $102,493 |
| **Cash at End of Period** | ($157,802) | ($213,552) | ($252,461) | ($309,661) | ($366,660) | ($432,160) | ($504,910) | $1,963,713 | $2,281,890 | $1,934,105 | $2,036,598 | $2,139,092 |

**CONFIDENTIAL – DO NOT DISSEMINATE.** This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

**RahRah!**  51

| | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|
| **Net Cash Flow from Operations** | | | | | |
| Net Profit | ($82,962) | $2,159,338 | $5,882,361 | $10,044,119 | $10,481,951 |
| Depreciation & Amortization | | | | | |
| Change in Accounts Receivable | $0 | $0 | $0 | $0 | $0 |
| Change in Inventory | | | | | |
| Change in Accounts Payable | $0 | $0 | $0 | $0 | $0 |
| Change in Income Tax Payable | ($19,090) | $81,806 | $238,189 | $270,121 | $42,882 |
| Change in Sales Tax Payable | $0 | $0 | $0 | $0 | $0 |
| Change in Prepaid Revenue | $0 | $0 | $0 | $0 | $0 |
| **Net Cash Flow from Operations** | ($102,052) | $2,241,144 | $6,120,550 | $10,314,240 | $10,524,833 |
| **Investing & Financing** | | | | | |
| Assets Purchased or Sold | | | | | |
| **Net Cash from Investing** | | | | | |
| Investments Received | | | | | |
| Dividends & Distributions | | | | | |
| Change in Short-Term Debt | | | | | |
| Change in Long-Term Debt | | | | | |
| **Net Cash from Financing** | | | | | |
| Cash at Beginning of Period | $0 | ($102,052) | $2,139,092 | $8,259,641 | $18,573,882 |
| Net Change in Cash | ($102,052) | $2,241,144 | $6,120,550 | $10,314,240 | $10,524,833 |
| **Cash at End of Period** | ($102,052) | $2,139,092 | $8,259,641 | $18,573,882 | $29,098,715 |

**CONFIDENTIAL – DO NOT DISSEMINATE.** This business plan contains confidential, trade-secret information and is shared only with the understanding that you will not share its contents or ideas with third parties without the express written consent of the plan author.

# Exhibit C

4/3/25, 6:19 PM                                            Gmail - RahRah - Executive Summary

 **RahRah - David Nelson:Emily Nelson.pdf**
1830K

---

**David Nelson** <dnelson@rahrahsolutions.com>
To: bmwoodside@gmail.com                                    Wed, Sep 13, 2023 at 2:25 PM
Cc: Brady Lipp <blipp@gpcchi.com>

Hi Ben,

Thanks for taking the time today.

I appreciated your feedback and all of your questions.  Here is the Electronic document of what I printed for you.  It has clickable links for reference.  Also, LinkedIn Bios of our current team members and tech partner.

Also, I have attached a BIO presentation of myself and my wife Emily, who has been with me throughout this whole journey since RahRah launched.  She knows the industry and has been instrumental in the admin and customer service part to this point and will also continue in those roles going forward.

All of the projections for first year growth for 2024 through 2027 for just the HS targets for Minneapolis/St Paul and Chicago.  Profit and Loss as well.

Please let me know if you have any questions or other thoughts. Email, text or just give me a call.

It was an awesome meeting and I look forward to circling back.
[Quoted text hidden]

---

**2 attachments**

 **RahRah Executive Summary - Ben Woodside.pdf**
1296K

 **RahRah - David Nelson:Emily Nelson.pdf**
1830K

# Exhibit D

DocuSign Envelope ID: C28E6C2D-29A8-4990-BC78-9B2B8D134B3B

## FINDER'S FEE AGREEMENT

THIS FINDER'S FEE AGREEMENT (the "Agreement") is entered into as of the date set forth on the signature page hereof by and between Tri State Solutions, LLC, DBA RahRah! (the "Company") and Great Point Capital, LLC **("Finder")** (and collectively, the "Parties").

The Company has expressed interest in raising capital with other institutions, banks and brokers and has asked Great Point Capital to assist in this regard through referral opportunities.

I)  Engagement as Finder

(a)  Engagement - The Company hereby engages Finder as its exclusive Agent to make introductions to qualified third parties ("Investor") that may be interested in investing directly with the Company. Upon introduction, the Company shall work directly with the Investor to discuss potential investments ("Transaction"), terms, structure and to prepare the documents that will detail the full terms and conditions of the Transaction (the "Transaction Documents").

(b)  Compensation - As compensation for the successful consummation of a Transaction, the Company shall pay Great Point Capital a finder's fee upon closing of a successful Transaction between the Company and Investor. To the extent permitted by applicable law and regulations, Great Point Capital will be paid for any Transaction with an Investor. A one-time payment of $15,000 is due and will be deducted from the initial investment funds received. Wire instructions are on Schedule A to this Agreement.

(c)  Registration – Great Point Capital represents that it is registered and in good standing with FINRA as a broker-dealer in a capacity which (i) allows us it to perform its obligation and representations herein (ii) permits it to participate in sales of the Securities and performance and contemplation of the Transaction. Great Point Capital also represents that it is duly registered as a broker-dealer under the applicable statutes and regulations of each state in which the Securities will be offered and sold.

(d)  Undertakings – Great Point Capital shall use its best efforts to locate Investors. It is understood that Great Point Capital has no commitment with regard to completion of a capital raise other than to use its best efforts to make introductions. In connection with the Transaction, Great Point Capital represents that it will comply fully with all applicable laws, and the rules of FINRA, the SEC, and state securities administrators in states. Payment of the finders' fee shall be conditioned as a direct result of the introduction by Finder of an Investor ready and willing to perform due diligence and invest directly with the Company.

2.  Representations and Warranties

The Company represents and warrants to Great Point Capital that:

(a)  The Company is duly organized and validly existing as a corporation and has full power and authority to conduct its business and sell the Securities;

(b)   The Company has all required governmental, regulatory and exchange approvals and licenses and has to its knowledge effected all filings and registrations required to conduct its business and perform its obligations hereunder;

(c)   This Agreement is undertaken by Great Point Capital on a "best efforts" basis, in a commercially reasonable manner, and that Great Point Capital makes no representation as to the success of the placement of the Securities, and will not be held responsible for damages (including consequential damages) or other liabilities in the event the Securities are not successfully placed except in the event of willful misconduct or gross negligence;

(d)   Except as disclosed in the Company's prospectus and other filings with the SEC, there are no actions, suits, proceedings or investigations pending or, to the best of the Company's knowledge, threatened against or affecting the Company which could prevent or interfere with or adversely affect the performance by the Company of its obligations hereunder.

(e)   The Finder is not acting as a placement agent, investment banker or broker, and is performing no diligence on the value or structure of the company. All diligence is to be completed by Investor, and the Company shall have ultimate responsibility to provide all necessary documentation to assist Investor in understanding the prospective Transaction.

3. Compensation

As compensation for the successful consummation of one or more Transactions, the Company shall pay Great Point Capital a success fee of 9% of the principal of any Transaction with an Investor and 8% warrant coverage. The Warrants will have an expiration date of September 30th, 2028 and an exercise price that will value RahRah at $3.6 million at the time the warrants are exercised.

4. Indemnification

The Company agrees to indemnify and hold harmless Great Point Capital and each person, if any, who controls Great Point Capital within the meaning of Section 15 of the Securities Act, from and against any and all losses, claims, damages, liabilities and expenses (including any investigation, legal and other expenses incurred in connection therewith, and any amount paid in settlement of, any action, suit or proceeding or any claim asserted) to which, jointly or severally, they, or any of them, may become subject under the Securities Act, the Securities Exchange Act of 1934, as amended, any other federal or state statutory or foreign law or regulation, at common law or otherwise, insofar as such losses, claims, damages, liabilities or expenses (or actions with respect thereto) arise out of or are based upon any untrue statement or alleged untrue statement of a material fact supplied by the Company and contained in the Transaction Documents, or any amendment or supplement thereto, or the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading; except insofar as any such untrue statement or omission was

DocuSign Envelope ID: C28E6C2D-29A8-4990-BC78-9B2B8D134B3B

made in the Transaction Documents in reliance upon and in conformity with information furnished in writing to the Company by Great Point Capital expressly for use therein.

If Great Point Capital asserts its right to be indemnified under this Section, it shall promptly notify the Company of the commencement of such action, suit or proceeding, enclosing a copy of all papers served, grant the Company with full and exclusive right to assume the defense thereof and any subsequent appeal at the Company's expense (i.e., such costs shall not be borne by Great Point Capital subject to reimbursement by the Company), provide the Company with all information and assistance reasonably requested by the Company in connection with the conduct of the defense and settlement and any subsequent appeal. Great Point Capital shall have the right to employ its own counsel at its expense. The Company shall not be liable for any settlement of any action or claim effected without its consent.

5.  Finders Only

Great Point Capital and the Finder are acting solely in the capacity of finder and make no commitment as to participation in the Transaction.

6.  Notices

Any notices under this Agreement shall be given or confirmed in writing and sent by registered or overnight mail, postage prepaid and addressed as follows or as specified by any party hereto by written notice to all other Parties hereto: (i) if to the Company, R a h R a h  S o l u t i o n s,  4 0 4 3  S h e r i d a n  A v e.  S,  M i n n e a p o l i s,  MN  5 5 4 1 0  and (ii) if to Great Point Capital, 2 00 W Jackson St, Ste 1000, Chicago, IL 60606.

7.  Entire Agreement

This Agreement contains the entire understanding of the Parties hereto with respect to the subject matter contained herein.

8.  Counterparts

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original agreement, but all of which together shall constitute one and the same instrument.

9.  Governing Law

This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

# SIGNATURE BLOCK TO FOLLOW

DocuSign Envelope ID: C28E6C2D-29A8-4990-BC78-9B2B8D134B3B

IN WITNESS WHEREOF, this Agreement has been executed by the Parties hereto as of the ___ day of _____ _____ 2023.

Tri State Solutions, LLC DBA RahRah! Solutions

DocuSigned by:

By: David Nelson CEO                    9/5/2023

Great Point Capital, LLC

DocuSigned by:

By: Joe Ramsdell,                       9/6/2023
Director of Private Equity

# Exhibit E

NEITHER THIS SECURITIES PURCHASE AGREEMENT NOR ANY OF THE SECURITIES ISSUABLE HEREUNDER HAS BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD, OR OTHERWISE TRANSFERRED, PLEDGED, OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT WITH RESPECT TO THE SECURITIES UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS, OR DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE COMPANY THAT SUCH OFFER, SALE, TRANSFER, PLEDGE, OR HYPOTHECATION IS IN COMPLIANCE WITH THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

## SECURITIES PURCHASE AGREEMENT

This Securities Purchase Agreement (this "Agreement") is made by and between RahRah Solutions, LLC, a Delaware limited liability company (the "Company"), and the undersigned ("Purchaser") as of the date that it is countersigned by an officer of the Company.

WHEREAS, to provide the Company with additional resources to conduct its business, Purchaser desires to invest in the Company the amount set forth on the signature page hereto (the "Investment Amount") in exchange for membership interests in the Company, subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the representations, warranties, and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows:

1.    Purchase and Sale. On the terms and subject to the conditions of this Agreement, at the Closing (as defined herein), the Purchaser shall purchase from the Company, and the Company shall sell and issue to the Purchaser, membership interests in the Company at a price equal to the amount listed as the Investment Amount on the signature page hereto, representing an interest in the Company equal to the fraction, the numerator of which is the price listed above, and the denominator of which is total amount of capital contributions reflected in the Company's Operating Agreement (the "Purchased Interest"), free and clear of all liens, claims, or other encumbrances ("Liens") other than restrictions under applicable securities laws and the operating agreement of the Company (the "Operating Agreement"). The Purchaser shall fund the purchase price payable for the Purchased Interest by making a capital contribution to the Company.

2.    Acceptance. The Company shall have the right to accept or reject (for any reason or no reason) this Agreement, and this Agreement shall be deemed to be accepted by the Company only when it is countersigned by an officer of the Company. The Company has no obligation to accept securities purchase agreements in the order received.

4.    Closing and Delivery.

DocuSign Envelope ID: 4B2AA6C8-1358-46E5-99C2-0B8C836AF5D6

(a)  *Closing.* If this Agreement is accepted by the Company, the closing of the sale and purchase of the Securities (the "Closing") will occur at such time as is determined by the Company.

(c)  *Purchaser Deliveries.* Prior to or at the Closing, unless otherwise specified by the Company, Purchaser shall deliver to the Company the following:

(i)  a check or wire transfer of immediately available funds in an amount equal to the Investment Amount;

(ii)  the Confidential Accredited Investor Questionnaire attached hereto as Exhibit A (the "Questionnaire"), completed and signed by Purchaser;

(iii)  a counterpart signature page to the Operating Agreement, signed by Purchaser; and

(iv)  the Internal Revenue Service Form W-9 – Request for Taxpayer Identification Number and Certification attached hereto as Exhibit B, completed and signed by Purchaser.

(d)  *Company Deliveries.* Following the Closing, the Company shall deliver to Purchaser the following:

(i)  a counterpart signature to the Operating Agreement, signed by the Company with the Purchased Interest reflected as a capital contribution to the Company.

5.    Representations and Warranties of the Company. The Company is duly organized, validly existing, and in good standing under the laws of the State of Delaware and has the requisite limited liability company power and authority to enter into this Agreement and to perform all the obligations required to be performed by it hereunder. Upon execution and delivery by the Company, this Agreement shall constitute a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

6.    Representations and Warranties of Purchaser. Purchaser represents and warrants to the Company as follows:

(a)  *Existence; Enforceability.* Purchaser is a natural person or is an entity duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization, as the case may be, and has the capacity or requisite power and authority, as the case may be, to acquire the Securities, to enter into this Agreement, and to perform all the obligations required to be performed by it hereunder. If Purchaser is not a natural person, then the party executing this Agreement on behalf of Purchaser is the trustee or other authorized officer or agent of Purchaser, and such party has due authority to execute this Agreement and does hereby legally bind Purchaser. Upon execution and delivery by Purchaser, this Agreement shall constitute a valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms.

DocuSign Envelope ID: 4B2AA6C8-1358-46E5-99C2-0B8C836AF5D6

(b)      *Investment Representations and Warranties.*

(i)      Purchaser acknowledges that the Securities to be issued to it by the Company pursuant to the terms and conditions set forth in this Agreement will not be registered under the Securities Act, or any state securities Laws and that the Securities will be issued pursuant to an exemption from such registration and qualification based in part upon its representations and warranties contained herein.

(ii)      Purchaser understands that no federal or state agency has passed upon the merits or risks of an investment in the Securities or made any finding or determination concerning the fairness or advisability of an investment in the Securities.

(iii)      Purchaser is familiar with the business and operations of the Company and has been given the opportunity to request and obtain from the Company all information that it deems necessary to enable it to make an informed investment decision concerning the acquisition of the Securities.

(iv)      Purchaser has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the investment contemplated by this Agreement and is able to bear the economic risk of the investment in the Company (including a complete loss of value of such investment). Purchaser recognizes that upon the consummation of the transactions contemplated hereby no public market shall exist for the Securities issued in accordance with the terms and conditions set forth in this Agreement and none may exist in the future.

(v)      The Questionnaire, as completed and signed by Purchaser, is true and correct in all respects. Purchaser is a resident of the State set forth on the signature page hereto.

(vi)      Purchaser is acquiring the Securities solely for its own beneficial account, for investment purposes, and not with a view to, or for resale in connection with, any distribution of the Securities.

(vii)      Purchaser understands that the Securities are "restricted securities" under applicable federal securities Laws and that the Securities Act and the rules of the U.S. Securities and Exchange Commission provide in substance that Purchaser may dispose of the Securities only pursuant to an effective registration statement under the Securities Act or an exemption therefrom.

(viii)      Purchaser agrees: (A) that it will not sell, assign, pledge, give, transfer, or otherwise dispose of the Securities or any interest therein, or make any offer or attempt to do any of the foregoing, except pursuant to a registration of the Securities under the Securities Act and all applicable state securities Laws, or in a

DocuSign Envelope ID: 4B2AA6C8-1358-46E5-99C2-0B8C836AF5D6

transaction which is exempt from the registration provisions of the Securities Act and all applicable state securities Laws, and in compliance with the Operating Agreement; and (B) that the Company and its affiliates shall not be required to give effect to any purported transfer of such Securities except upon compliance with the foregoing restrictions.

(c)    *No Breach.* Purchaser is not subject to, or obligated under, any provision of (i) any contract, (ii) any license, franchise, or permit, or (iii) any Law that would be breached or violated, or in respect of which a right of termination or acceleration or any encumbrance or other lien on any of its assets would be created, by its execution, delivery, and performance of this Agreement or the consummation of the transactions contemplated hereby. No authorization, consent, or approval of, waiver or exemption by, or filing or registration with, any Governmental Entity or any other third party is necessary on Purchaser's part for the consummation of the transactions contemplated by this Agreement that has not previously been obtained by it.

7.    <u>Survival of Representations and Warranties</u>. All representations and warranties contained in this Agreement shall survive the consummation of the transactions contemplated by this Agreement.

8.    <u>Indemnification</u>. Purchaser agrees to indemnify and hold harmless the Company and its affiliates and each of their respective managers, directors, officers, employees, agents, and representatives to the fullest extent permitted by applicable Law from and against any and all actions, suits, claims, proceedings, costs, damages, judgments, amounts paid in settlement, and expenses (including, without limitation, attorneys' fees and disbursements) arising out of, or resulting from, any inaccuracy in, or breach of, the representations, warranties, or agreements made by it in this Agreement.

9.    <u>Assurances</u>. Each party shall, from time to time upon the other party's reasonable request and without additional consideration, execute and deliver such additional documents and take all such further action as may be necessary or desirable to consummate and make effective the transactions contemplated by this Agreement.

10.    <u>Notices</u>. All notices, requests, consents, and other communications hereunder shall be in writing and shall be deemed effectively given and received upon delivery in person, or one (1) business day after delivery by national overnight courier service, or three (3) business days after deposit via certified or registered mail, return receipt requested, in each case addressed as follows:

<u>If to the Company, to:</u>

RahRah Solutions, LLC
4043 Sheridan Avenue South
Minneapolis, MN 55410

<u>If to Purchaser, to:</u>

DocuSign Envelope ID: 4B2AA6C8-1358-46E5-99C2-0B8C836AF5D6

The address set forth on the signature page hereto.

or, in any such case, at such other address or addresses as shall have been furnished in writing by such party to the other party.

11.    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the Laws of the State of Minnesota applicable to contracts made and to be performed entirely within the State of Minnesota without regard to principles of conflicts or choice of law.

12.    <u>Entire Agreement</u>. This Agreement and the other agreements and instruments expressly provided for herein and therein together set forth the entire understanding of the parties and supersede in their entirety all prior contracts, agreements, arrangements, communications, discussions, representations, and warranties, whether oral or written, among the parties.

13.    <u>Severability</u>. If any provision of this Agreement shall be declared void or unenforceable by a judicial or administrative authority, the validity of any other provision and of the entire Agreement shall not be affected thereby and to such end the provisions of this Agreement are agreed to be severable.

14.    <u>Headings</u>. The section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

15.    <u>Expenses</u>. Each party hereto shall be responsible for all of its own expenses incurred in connection with the negotiation, execution, and delivery of this Agreement and the performance of its obligations hereunder.

16.    <u>No Third Party Beneficiaries</u>. This Agreement is solely for the benefit of the parties and is not intended to confer upon any other person or entity any rights or remedies hereunder.

17.    <u>Counterparts; Execution by Facsimile or Other Electronic Transmission</u>. This Agreement may be executed and delivered in counterparts (including via facsimile or other electronic transmission), each of which shall be deemed an original and all of which shall constitute one and the same agreement.

18.    <u>Successors and Assigns; Amendments</u>. This Agreement shall be binding upon and inure to the parties and their permitted successors and assigns. This Agreement may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each of the parties.

19.    <u>Consent to Jurisdiction</u>. Each of the parties hereto (a) consents to submit itself to the personal jurisdiction of any federal or state court located in the State of Minnesota in the event that any dispute arises out of this Agreement or the transactions contemplated by this Agreement, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, and (c) agrees that it will not bring any action, suit, or

proceeding relating to this Agreement or the transactions contemplated by this Agreement in any court other than a federal or state court located in State of Minnesota.

20.    Waiver of Jury Trial. **THE PARTIES HERETO WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING UNDER THIS AGREEMENT OR ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, REGARDLESS OF WHICH PARTY INITIATES SUCH ACTION, SUIT, OR PROCEEDING.**

21.    Defined Terms. For purposes of this Agreement, the following capitalized terms have the meanings set forth below:

"Governmental Entity" means (i) any federal, state, local, municipal, foreign, or other government; (ii) any governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, entity, or regulatory organization and any court or other tribunal); (iii) any body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, regulatory, or taxing authority or power of any nature, including any arbitral tribunal; and (iv) any agency, authority, board, bureau, commission, department, office, or instrumentality of any nature whatsoever of any federal, state, province, local, municipal, or foreign government or other political subdivision or otherwise.

"Law" means any federal, state, local, municipal, or foreign statute, law, ordinance, regulation, rule, code, order, controlling common law, or order enacted, promulgated, issued, enforced, or entered by any Governmental Entity.

*[Signature page follows.]*

DocuSign Envelope ID: 4B2AA6C8-1358-46E5-99C2-0B8C836AF5D6

IN WITNESS WHEREOF, the undersigned has duly executed, or has caused its duly authorized representative to execute, this Agreement as of the date that it is countersigned by an officer of the Company.

Investment Amount: $ 500,000.00

Address: 4266 38th Ave S.
Fargo
ND
58104

*Individuals Sign Here:*

Ben Woodside

Name: Ben Woodside

*Entities Sign Here:*

Name of Entity: _____

By: _____
Name: _____
Title: _____

*Accepted by*

**RAHRAH SOLUTIONS, LLC**

By: _____
Name: David Nelson
Title: Manager
Date: _____

# Exhibit F

DocuSign Envelope ID: C2CC0F0F-AE7B-4746-AF2D-DC4D57E64B06

NEITHER THIS SECURITIES PURCHASE AGREEMENT NOR ANY OF THE SECURITIES ISSUABLE HEREUNDER HAS BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD, OR OTHERWISE TRANSFERRED, PLEDGED, OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT WITH RESPECT TO THE SECURITIES UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS, OR DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE COMPANY THAT SUCH OFFER, SALE, TRANSFER, PLEDGE, OR HYPOTHECATION IS IN COMPLIANCE WITH THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

## SECURITIES PURCHASE AGREEMENT

This Securities Purchase Agreement (this "Agreement") is made by and between RahRah Solutions, LLC, a Delaware limited liability company (the "Company"), and the undersigned ("Purchaser") as of the date that it is countersigned by an officer of the Company.

WHEREAS, to provide the Company with additional resources to conduct its business, Purchaser desires to invest in the Company the amount set forth on the signature page hereto (the "Investment Amount") in exchange for membership interests in the Company, subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the representations, warranties, and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows:

1.    Purchase and Sale. On the terms and subject to the conditions of this Agreement, at the Closing (as defined herein), the Purchaser shall purchase from the Company, and the Company shall sell and issue to the Purchaser, membership interests in the Company at a price equal to the amount listed as the Investment Amount on the signature page hereto, representing an interest in the Company equal to the fraction, the numerator of which is the price listed above, and the denominator of which is total amount of capital contributions reflected in the Company's Operating Agreement (the "Purchased Interest"), free and clear of all liens, claims, or other encumbrances ("Liens") other than restrictions under applicable securities laws and the operating agreement of the Company (the "Operating Agreement"). The Purchaser shall fund the purchase price payable for the Purchased Interest by making a capital contribution to the Company.

2.    Acceptance. The Company shall have the right to accept or reject (for any reason or no reason) this Agreement, and this Agreement shall be deemed to be accepted by the Company only when it is countersigned by an officer of the Company. The Company has no obligation to accept securities purchase agreements in the order received.

4.    Closing and Delivery.

(a)  *Closing.* If this Agreement is accepted by the Company, the closing of the sale and purchase of the Securities (the "Closing") will occur at such time as is determined by the Company.

(c)  *Purchaser Deliveries.* Prior to or at the Closing, unless otherwise specified by the Company, Purchaser shall deliver to the Company the following:

(i)  a check or wire transfer of immediately available funds in an amount equal to the Investment Amount;

(ii)  the Confidential Accredited Investor Questionnaire attached hereto as Exhibit A (the "Questionnaire"), completed and signed by Purchaser;

(iii)  a counterpart signature page to the Operating Agreement, signed by Purchaser; and

(iv)  the Internal Revenue Service Form W-9 − Request for Taxpayer Identification Number and Certification attached hereto as Exhibit B, completed and signed by Purchaser.

(d)  *Company Deliveries.* Following the Closing, the Company shall deliver to Purchaser the following:

(i)  a counterpart signature to the Operating Agreement, signed by the Company with the Purchased Interest reflected as a capital contribution to the Company.

5.  Representations and Warranties of the Company. The Company is duly organized, validly existing, and in good standing under the laws of the State of Delaware and has the requisite limited liability company power and authority to enter into this Agreement and to perform all the obligations required to be performed by it hereunder. Upon execution and delivery by the Company, this Agreement shall constitute a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

6.  Representations and Warranties of Purchaser. Purchaser represents and warrants to the Company as follows:

(a)  *Existence; Enforceability.* Purchaser is a natural person or is an entity duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization, as the case may be, and has the capacity or requisite power and authority, as the case may be, to acquire the Securities, to enter into this Agreement, and to perform all the obligations required to be performed by it hereunder. If Purchaser is not a natural person, then the party executing this Agreement on behalf of Purchaser is the trustee or other authorized officer or agent of Purchaser, and such party has due authority to execute this Agreement and does hereby legally bind Purchaser. Upon execution and delivery by Purchaser, this Agreement shall constitute a valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms.

DocuSign Envelope ID: C2CC0F0F-AE7B-4746-AF2D-DC4D57E64B06

(b)    *Investment Representations and Warranties.*

(i)    Purchaser acknowledges that the Securities to be issued to it by the Company pursuant to the terms and conditions set forth in this Agreement will not be registered under the Securities Act, or any state securities Laws and that the Securities will be issued pursuant to an exemption from such registration and qualification based in part upon its representations and warranties contained herein.

(ii)    Purchaser understands that no federal or state agency has passed upon the merits or risks of an investment in the Securities or made any finding or determination concerning the fairness or advisability of an investment in the Securities.

(iii)    Purchaser is familiar with the business and operations of the Company and has been given the opportunity to request and obtain from the Company all information that it deems necessary to enable it to make an informed investment decision concerning the acquisition of the Securities.

(iv)    Purchaser has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the investment contemplated by this Agreement and is able to bear the economic risk of the investment in the Company (including a complete loss of value of such investment). Purchaser recognizes that upon the consummation of the transactions contemplated hereby no public market shall exist for the Securities issued in accordance with the terms and conditions set forth in this Agreement and none may exist in the future.

(v)    The Questionnaire, as completed and signed by Purchaser, is true and correct in all respects. Purchaser is a resident of the State set forth on the signature page hereto.

(vi)    Purchaser is acquiring the Securities solely for its own beneficial account, for investment purposes, and not with a view to, or for resale in connection with, any distribution of the Securities.

(vii)    Purchaser understands that the Securities are "restricted securities" under applicable federal securities Laws and that the Securities Act and the rules of the U.S. Securities and Exchange Commission provide in substance that Purchaser may dispose of the Securities only pursuant to an effective registration statement under the Securities Act or an exemption therefrom.

(viii)    Purchaser agrees: (A) that it will not sell, assign, pledge, give, transfer, or otherwise dispose of the Securities or any interest therein, or make any offer or attempt to do any of the foregoing, except pursuant to a registration of the Securities under the Securities Act and all applicable state securities Laws, or in a

transaction which is exempt from the registration provisions of the Securities Act and all applicable state securities Laws, and in compliance with the Operating Agreement; and (B) that the Company and its affiliates shall not be required to give effect to any purported transfer of such Securities except upon compliance with the foregoing restrictions.

(c)  *No Breach.* Purchaser is not subject to, or obligated under, any provision of (i) any contract, (ii) any license, franchise, or permit, or (iii) any Law that would be breached or violated, or in respect of which a right of termination or acceleration or any encumbrance or other lien on any of its assets would be created, by its execution, delivery, and performance of this Agreement or the consummation of the transactions contemplated hereby. No authorization, consent, or approval of, waiver or exemption by, or filing or registration with, any Governmental Entity or any other third party is necessary on Purchaser's part for the consummation of the transactions contemplated by this Agreement that has not previously been obtained by it.

7.    Survival of Representations and Warranties. All representations and warranties contained in this Agreement shall survive the consummation of the transactions contemplated by this Agreement.

8.    Indemnification. Purchaser agrees to indemnify and hold harmless the Company and its affiliates and each of their respective managers, directors, officers, employees, agents, and representatives to the fullest extent permitted by applicable Law from and against any and all actions, suits, claims, proceedings, costs, damages, judgments, amounts paid in settlement, and expenses (including, without limitation, attorneys' fees and disbursements) arising out of, or resulting from, any inaccuracy in, or breach of, the representations, warranties, or agreements made by it in this Agreement.

9.    Assurances. Each party shall, from time to time upon the other party's reasonable request and without additional consideration, execute and deliver such additional documents and take all such further action as may be necessary or desirable to consummate and make effective the transactions contemplated by this Agreement.

10.    Notices. All notices, requests, consents, and other communications hereunder shall be in writing and shall be deemed effectively given and received upon delivery in person, or one (1) business day after delivery by national overnight courier service, or three (3) business days after deposit via certified or registered mail, return receipt requested, in each case addressed as follows:

If to the Company, to:

RahRah Solutions, LLC
4043 Sheridan Avenue South
Minneapolis, MN 55410

If to Purchaser, to:

DocuSign Envelope ID: C2CC0F0F-AE7B-4746-AF2D-DC4D57E64B06

The address set forth on the signature page hereto.

or, in any such case, at such other address or addresses as shall have been furnished in writing by such party to the other party.

11.    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the Laws of the State of Minnesota applicable to contracts made and to be performed entirely within the State of Minnesota without regard to principles of conflicts or choice of law.

12.    <u>Entire Agreement</u>. This Agreement and the other agreements and instruments expressly provided for herein and therein together set forth the entire understanding of the parties and supersede in their entirety all prior contracts, agreements, arrangements, communications, discussions, representations, and warranties, whether oral or written, among the parties.

13.    <u>Severability</u>. If any provision of this Agreement shall be declared void or unenforceable by a judicial or administrative authority, the validity of any other provision and of the entire Agreement shall not be affected thereby and to such end the provisions of this Agreement are agreed to be severable.

14.    <u>Headings</u>. The section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

15.    <u>Expenses</u>. Each party hereto shall be responsible for all of its own expenses incurred in connection with the negotiation, execution, and delivery of this Agreement and the performance of its obligations hereunder.

16.    <u>No Third Party Beneficiaries</u>. This Agreement is solely for the benefit of the parties and is not intended to confer upon any other person or entity any rights or remedies hereunder.

17.    <u>Counterparts; Execution by Facsimile or Other Electronic Transmission</u>. This Agreement may be executed and delivered in counterparts (including via facsimile or other electronic transmission), each of which shall be deemed an original and all of which shall constitute one and the same agreement.

18.    <u>Successors and Assigns; Amendments</u>. This Agreement shall be binding upon and inure to the parties and their permitted successors and assigns. This Agreement may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each of the parties.

19.    <u>Consent to Jurisdiction</u>. Each of the parties hereto (a) consents to submit itself to the personal jurisdiction of any federal or state court located in the State of Minnesota in the event that any dispute arises out of this Agreement or the transactions contemplated by this Agreement, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, and (c) agrees that it will not bring any action, suit, or

DocuSign Envelope ID: C2CC0F0F-AE7B-4746-AF2D-DC4D57E64B06

proceeding relating to this Agreement or the transactions contemplated by this Agreement in any court other than a federal or state court located in State of Minnesota.

    20.    <u>Waiver of Jury Trial</u>. **THE PARTIES HERETO WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING UNDER THIS AGREEMENT OR ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, REGARDLESS OF WHICH PARTY INITIATES SUCH ACTION, SUIT, OR PROCEEDING.**

    21.    <u>Defined Terms</u>. For purposes of this Agreement, the following capitalized terms have the meanings set forth below:

"<u>Governmental Entity</u>" means (i) any federal, state, local, municipal, foreign, or other government; (ii) any governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, entity, or regulatory organization and any court or other tribunal); (iii) any body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, regulatory, or taxing authority or power of any nature, including any arbitral tribunal; and (iv) any agency, authority, board, bureau, commission, department, office, or instrumentality of any nature whatsoever of any federal, state, province, local, municipal, or foreign government or other political subdivision or otherwise.

"<u>Law</u>" means any federal, state, local, municipal, or foreign statute, law, ordinance, regulation, rule, code, order, controlling common law, or order enacted, promulgated, issued, enforced, or entered by any Governmental Entity.

*[Signature page follows.]*

DocuSign Envelope ID: C2CC0F0F-AE7B-4746-AF2D-DC4D57E64B06

IN WITNESS WHEREOF, the undersigned has duly executed, or has caused its duly authorized representative to execute, this Agreement as of the date that it is countersigned by an officer of the Company.

Investment Amount: $ 500,000.00 _____

Address:    323 48th Ave. SW
            Moorhead
            MN
            56560

*Individuals Sign Here:*

Ray kvalvog

Name: ___DocuSigned by: Ray Kvalvog___

*Entities Sign Here:*

Name of Entity: _____

By: _____
Name: _____
Title: _____

*Accepted by*

**RAHRAH SOLUTIONS, LLC**

By: _____
Name: David Nelson
Title: Manager
Date: _____

# Exhibit G

DocuSign Envelope ID: 4B2AA6C8-1358-46E5-99C2-0B8C836AF5D6

# Limited Liability Company Agreement

# of

# RahRah Solutions, LLC

Dated September 14, 2023

129057949v7

DocuSign Envelope ID: 4B2AA6C8-1358-46E5-99C2-0B8C836AF5D6

# TABLE OF CONTENTS

ARTICLE I Organizational Matters ............................................................................... 3
ARTICLE II Members................................................................................................... 3
ARTICLE III Management............................................................................................ 7
ARTICLE IV Allocations ............................................................................................. 8
ARTICLE V Distributions ............................................................................................ 9
ARTICLE VI Transfers ................................................................................................ 9
ARTICLE VII No Personal Liability and Indemnification ......................................... 11
ARTICLE VIII Accounting and Tax Matters.............................................................. 12
ARTICLE IX Dissolution and Liquidation................................................................. 18
ARTICLE X Definitions.............................................................................................. 19
ARTICLE XI Miscellaneous ...................................................................................... 22

# LIMITED LIABILITY COMPANY AGREEMENT

This Limited Liability Company Agreement (this "**Agreement**") of RahRah Solutions, LLC, a Delaware limited liability company (the "**Company**"), is entered into effective as of September 14, 2023 by and among the Company, David Nelson, Jeremy Lipinski, Anders Haugen, Robert Bonine, White Rabbit Trust, Ben Woodside, Ray Kvalvog, and any other Person who, after the date hereof, becomes a Member in accordance with the terms of this Agreement (collectively, the "**Members**"). Unless otherwise noted or defined elsewhere in this Agreement, capitalized terms used in this Agreement have the meanings ascribed herein, as more fully set forth in ARTICLE XI.

## ARTICLE I
## Organizational Matters

**Section 1.01    Name.** The name of the Company is RahRah Solutions, LLC.

**Section 1.02    Principal Office.** The principal office of the Company is located at 4043 Sheridan Avenue South, Minneapolis, Minnesota 55410, or such other location as may from time to time be determined by the Manager. The Manager shall give prompt notice of any such change to each of the Members.

**Section 1.03    Registered Office; Registered Agent.** The registered office of the Company and the registered agent for service of process on the Company in the State of Delaware shall be that office and Person named in the Certificate of Formation or such other office (which need not be a place of business of the Company) or such other Person or Persons as the Manager may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

**Section 1.04    Purpose; Powers.**

(a)    The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Delaware Act and to engage in any and all lawful activities necessary or incidental thereto.

(b)    The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the Delaware Act.

**Section 1.05    Term.** The term of the Company commenced on the date and time the Certificate of Formation was filed with the Secretary of State of the State of Delaware and shall continue in existence perpetually or until any earlier date when the Company is terminated in accordance with the provisions of this Agreement or as provided by Applicable Law.

## ARTICLE II
## Members

**Section 2.01    Members.** The names, mailing addresses, and Membership Interests of the Members are set out in Schedule I attached hereto (the "**Members Schedule**"). The Manager shall

DocuSign Envelope ID: 4B2AA6C8-1358-46E5-99C2-0B8C836AF5D6

maintain and update the Members Schedule upon the issuance or Transfer of any Membership Interests to any new or existing Member in accordance with this Agreement.

**Section 2.02   Capital Contributions; Capital Accounts; No Withdrawals.**

(a)      The Members have contributed to the Company the amounts, in the form of cash, property, services, or a promissory note or other obligation (as such amounts may be amended herein from time to time, the "**Capital Contributions**") set out in the Members Schedule. No Member is required to make additional Capital Contributions to the Company.

(b)      The Company shall establish and maintain for each Member a separate capital account (a "**Capital Account**") on its books and records in accordance with the provisions of Section 704(b) of the Code and Treasury Regulations Section 1.704-1(b)(2)(iv). Each Capital Account shall be (i) credited by such Member's Capital Contributions to the Company and any profits allocated to such Member in accordance with Section 4.01 and (ii) debited by any distributions to such Member pursuant to Section 5.01(a) and any losses allocated to such Member in accordance with Section 4.01. For purposes of maintaining the Members' Capital Accounts, profits and losses shall be determined in accordance with Treasury Regulation Section 1.704-1(b). The Capital Accounts shall be adjusted by the Manager upon the occurrence of an event described in Treasury Regulations Section 1.704-1(b)(2)(iv)(f)(5) in the manner described in Treasury Regulations Section 1.704-1(b)(2)(iv)(f)(5) and (g) if the Manager determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members. In the event of a Transfer of any Membership Interest in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the transferred Membership Interest.

(c)      No Member shall be entitled to withdraw any part of its Capital Account or to receive any distribution from the Company, except as otherwise provided in this Agreement.

**Section 2.03   Admission of Additional Members.**

(a)      Additional Members may be admitted from time to time in connection with (i) the issuance of Membership Interests by the Company, subject to compliance with the provisions of Section 3.02(b), or (ii) a Transfer of Membership Interests, subject to compliance with the provisions of ARTICLE VI, and in either case, following compliance with the provisions of Section 2.03(b).

(b)      In order for any Person not already a Member of the Company to be admitted as a Member, whether pursuant to an issuance or a Transfer (including a Permitted Transfer) of Membership Interests, such Person shall have executed and delivered to the Company a written Joinder Agreement (a "**Joinder Agreement**") in a form satisfactory to the Company. Upon the amendment of the Members Schedule by the Manager and the satisfaction of any other applicable conditions, including, if a condition, the receipt by the Company of payment for the issuance of the applicable Membership Interests, such Person

129057949v7

shall be admitted as a Member, shall be a party hereto, shall be deemed listed as such on the books and records of the Company, and thereupon shall be issued his, her, or its Membership Interests. The Manager shall also adjust the Capital Accounts of the Members as necessary in accordance with Section 2.02.

**Section 2.04    No Withdrawal; Death of Member.**

(a)    So long as a Member continues to hold any Membership Interest, such Member shall not have the ability to withdraw as a Member prior to the dissolution and winding up of the Company and any such withdrawal or attempted withdrawal by a Member prior to the dissolution and winding up of the Company shall be null and void. As soon as any Member ceases to hold any Membership Interests, such Person shall no longer be a Member.

(b)    The death of any Member shall not cause the dissolution of the Company. In such event, the Company and its business shall be continued by the remaining Member or Members, and the economic rights of the Membership Interests owned by the deceased Member shall be automatically Transferred to such Member's executors, administrators, testamentary trustees, legatees, distributees or beneficiaries, as applicable, as Permitted Transferees; provided, that any such Permitted Transferee shall be admitted as a Member only upon compliance with the provisions of Section 2.03(b) (the "**Beneficiary**"). The Beneficiary will retain the economic rights in the Membership Interests granted hereunder but shall have no rights to vote such Membership Interests and no rights to participate in the management of the Company.

**Section 2.05    Certification of Membership Interests.**

(a)    The Company may, but shall not be required to, issue certificates evidencing Membership Interests in the Company.

(b)    If the Manager shall issue certificates representing Membership Interests in accordance with Section 2.05(a), then in addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Membership Interests shall bear a legend substantially in the following form:

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, GIFT, PLEDGE, ENCUMBRANCE, HYPOTHECATION, OR OTHER DISPOSITION OF THE MEMBERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT.

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS

AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED, OR OTHERWISE DISPOSED EXCEPT PURSUANT TO (A) A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS, OR (B) AN EXEMPTION FROM REGISTRATION THEREUNDER.

**Section 2.06  Meetings.**

(a)    Meetings of the Members may be called by (i) the Manager or (ii) a Member or group of Members holding more than 50% of the Membership Interests.

(b)    Written notice stating the place, date, and time of the meeting and, in the case of a meeting of the Members not regularly scheduled, describing the purposes for which the meeting is called, shall be delivered not fewer than five days and not more than sixty days before the date of the meeting to each Member, by or at the direction of the Manager or the Member(s) calling the meeting, as the case may be. The Members may hold meetings at the Company's principal office or at such other place, as the Manager or the Member(s) calling the meeting may designate in the notice for such meeting.

(c)    Any Member may participate in a meeting of the Members by means of conference telephone or other communications equipment by means of which all Persons participating in the meeting hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(d)    On any matter that is to be voted on by the Members, a Member may vote in person or by proxy, and such proxy may be granted in writing, by means of Electronic Transmission, or as otherwise permitted by Applicable Law. Every proxy shall be revocable in the discretion of the Member executing it unless otherwise provided in such proxy; *provided,* that such right to revocation shall not invalidate or otherwise affect actions taken under such proxy prior to such revocation.

(e)    The business to be conducted at such meeting need not be limited to the purpose described in the notice and can include other business to be conducted by the Members; *provided,* that the Members shall have been notified of the meeting in accordance with Section 2.06(b). Attendance of a Member at any meeting shall constitute a waiver of notice of such meeting, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(f)    A quorum of any meeting of the Members shall require the presence, whether in person or by proxy, of the Members holding a majority of the Membership Interests. Subject to Section 2.07, no action may be taken by the Members unless the appropriate quorum is present at a meeting.

(g)    Subject to Section 2.07, Section 3.02 and any other provision of this Agreement or the Delaware Act requiring the vote, consent, or approval of a different percentage of the Membership Interests, no action may be taken by the Members at any meeting at which a quorum is present without the affirmative vote of the Members holding a majority of the Membership Interests.

**Section 2.07    Action Without Meeting.** Notwithstanding the provisions of Section 2.06, any matter that is to be voted on, consented to, or approved by Members may be taken without a meeting, without prior notice, and without a vote if consented to, in writing or by Electronic Transmission, by a Member or Members holding not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which each Member entitled to vote on the action is present and votes. A record shall be maintained by the Manager of each such action taken by written consent of a Member or Members.

## ARTICLE III
## Management

**Section 3.01    Management of the Company.** Subject to the provisions of Section 3.02 and except as otherwise provided by the Delaware Act, the business, property and affairs of the Company shall be managed by the Manager and the Business Advisor. The actions of the Manager and the Business Advisor taken in accordance with the provisions of this Agreement shall bind the Company. No other Member of the Company shall have any authority or right to act on behalf of or bind the Company, unless otherwise provided herein or unless specifically authorized by the Manager pursuant to a duly adopted resolution expressly authorizing such action.

**Section 3.02    Actions Requiring Approval of Members.** Without the written approval of Members holding a majority of the Membership Interests, the Company shall not, and shall not enter into any commitment to:

(a)    Amend, modify, or waive any provisions of the Certificate of Formation or this Agreement; *provided* that the Manager may, without the consent of the other Members, amend the Members Schedule following any new issuance, redemption, repurchase, or Transfer of Membership Interests in accordance with this Agreement.

(b)    Issue additional Membership Interests, Equity Securities, or other securities or, except in connection with a Transfer of Membership Interests that complies with the applicable provisions of ARTICLE VI and Section 2.03(b), admit additional Members to the Company.

(c)    Enter into or effect any transaction or series of related transactions involving the purchase, lease, exchange, or other acquisition (including by merger, consolidation, sale of stock, or acquisition of assets) by the Company of any assets and/or equity interests, other than in the ordinary course of business consistent with past practice.

(d)    Enter into or effect any transaction or series of related transactions involving the sale, lease, exchange, or other disposition (including by merger, consolidation, sale of stock, or sale of assets) by the Company of any assets and/or equity interests, other than sales of inventory in the ordinary course of business consistent with past practice.

(e)    Dissolve, wind up, or liquidate the Company or initiate a bankruptcy proceeding involving the Company.

DocuSign Envelope ID: 4B2AA6C8-1358-46E5-99C2-0B8C836AF5D6

**Section 3.03   Officers.** The Manager may appoint one or more individuals as officers of the Company (the "**Officers**") as the Manager deems necessary or desirable to carry on the business of the Company and may delegate to such Officers such power and authority as the Manager deems advisable. An Officer is not required to be a Member of the Company. Any individual may hold two or more offices of the Company. Each Officer shall hold office until his or her successor is designated by the Manager or until his or her earlier death, resignation, or removal. Any Officer may resign at any time upon written notice to the Manager. Any Officer may be removed by the Manager at any time, with or without cause. A vacancy in any office occurring because of death, resignation, removal, or otherwise may, but need not, be filled by the Manager.

**Section 3.04   Replacement and Resignation of Manager.** The Manager may be removed at any time, with or without cause, by the Members holding more than a majority of the Membership Interests. The Manager may resign at any time by delivering a written resignation to the Company, which resignation shall be effective upon receipt thereof unless it is specified to be effective at some other time or upon the occurrence of a particular event. Following the Manager's removal or resignation, a successor Manager shall be elected by the affirmative vote of the Members holding a majority of the Membership Interests. The removal of the Manager shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of such Member from the Company.

## ARTICLE IV
### Allocations

**Section 4.01   Allocation of Profits and Losses.**

(a)     The Company's profits and losses for each Fiscal Year will be allocated among the Members pro rata in accordance with their Membership Interests.

(b)     Notwithstanding any other provision of this Agreement, (i) "partner nonrecourse deductions" (as defined in Treasury Regulations Section 1.704-2(i)), if any, of the Company shall be allocated for each Fiscal Year to the Member that bears the economic risk of loss within the meaning of Treasury Regulations Section 1.704-2(i) and "nonrecourse deductions" (as defined in Treasury Regulations Section 1.704-2(b)) and "excess nonrecourse liabilities" (as defined in Treasury Regulations Section 1.752-3(a)), if any, shall be allocated to and among the Members in accordance with their Membership Interests.

(c)     This Agreement shall be deemed to include "qualified income offset," "minimum gain chargeback," and "partner nonrecourse debt minimum gain chargeback" provisions within the meaning of Treasury Regulations under Section 704(b) of the Code.

(d)     All items of income, gain, loss, deduction, and credit of the Company shall be allocated among the Members for federal, state, and local income tax purposes consistent with the manner that the corresponding items are allocated among the Members pursuant to this section, except as may otherwise be provided herein or under the Code.

129057949v7

**ARTICLE V**
**Distributions**

**Section 5.01    Distributions.**

(a)    Distributions of available cash shall be made to the Members at the times and in the aggregate amounts determined by the Manager and the Business Advisor. Such distributions shall be paid to the Members pro rata in accordance with their respective Membership Interests.

(b)    Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distribution to Members if such distribution would violate Section 18-607 of the Delaware Act or other Applicable Law.

**Section 5.02    Tax Distributions.**

(a)    Within 45 days after the end of each calendar quarter, or as soon thereafter as practicable, if, in the Manager's sole discretion, the Company has sufficient funds available for distribution, the Company will calculate and distribute to each Member such amount as is required for each Member to meet all or a portion, as determined by the Manager, of its applicable federal, state and local income tax obligations, provided that any distributions made by the Company hereunder shall be made in proportion to the Members' respective percentage of Membership Interests.

**ARTICLE VI**
**Transfers**

**Section 6.01    General Restrictions on Transfer.**

(a)    Except as permitted pursuant to Section 6.02, no Member shall Transfer all or any portion of its Membership Interest in the Company, except to other Members or except with (i) the written consent of Members holding a majority of the Membership Interests, or (ii) the written consent of the Manager and the Business Advisor. No Transfer of Membership Interests to a Person not already a Member of the Company shall be deemed completed until the prospective Transferee is admitted as a Member of the Company in accordance with Section 2.03 hereof.

(b)    Notwithstanding any other provision of this Agreement (including Section 6.02), each Member agrees that it will not Transfer all or any portion of its Membership Interest in the Company, and the Company agrees that it shall not issue any Membership Interests:

(i)    except as permitted under the Securities Act and other applicable federal or state securities or blue sky laws, and then, with respect to a Transfer of Membership Interests, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

DocuSign Envelope ID: 4B2AA6C8-1358-46E5-99C2-0B8C836AF5D6

(ii)    if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Section 7704(b) of the Code within the meaning of Treasury Regulation Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulation Section 1.7704-1(h)(3);

(iii)    if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the Delaware Act;

(iv)    if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

(v)    if such Transfer or issuance would cause the Company to be required to register as an investment company under the Investment Company Act of 1940, as amended; or

(vi)    if such Transfer or issuance would cause the assets of the Company to be deemed "Plan Assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company.

(c)    Any Transfer or attempted Transfer of any Membership Interest in violation of this Agreement shall be null and void, no such Transfer shall be recorded on the Company's books, and the purported Transferee in any such Transfer shall not be treated (and the purported Transferor shall continue be treated) as the owner of such Membership Interest for all purposes of this Agreement.

(d)    Except as provided in Section 2.04(b), no Transfer (including a Permitted Transfer) of Membership Interests to a Person not already a Member of the Company shall be deemed completed until the prospective Transferee (including a Permitted Transferee) is admitted as a Member of the Company in accordance with Section 2.03(b) hereof.

(e)    For the avoidance of doubt, any Transfer of a Membership Interest permitted by this Agreement shall be deemed a sale, transfer, assignment, or other disposal of such Membership Interest in its entirety as intended by the parties to such Transfer, and shall not be deemed a sale, transfer, assignment, or other disposal of any less than all of the rights and benefits described in the definition of the term "Membership Interest," unless otherwise explicitly agreed to by the parties to such Transfer.

**Section 6.02    Permitted Transfers.** The provisions of Section 6.01(a) shall not apply to any Transfer by any Member of all or any portion of its Membership Interest to any of the following (each, a "**Permitted Transferee**" and, any such Transfer to a Permitted Transferee, a "**Permitted Transfer**"):

(a)    Any Affiliate of such Member; or

(b)    With respect to any Member that is a natural Person, (i) such Member's Spouse, parent, siblings, descendants (including adoptive relationships and stepchildren), and the Spouse of each such natural persons (collectively, "**Family Members**"); (ii) a trust

DocuSign Envelope ID: 4B2AA6C8-1358-46E5-99C2-0B8C836AF5D6

under which the distribution of Membership Interests may be made only to such Member and/or any Family Member of such Member; (iii) a charitable remainder trust, the income from which will be paid to such Member during his life; (iv) a corporation, partnership, or limited liability company, the stockholders, partners, or members of which are only such Member and/or Family Members of such Member; or (v) by will or by the laws of intestate succession, to such Member's executors, administrators, testamentary trustees, legatees, distributees, or beneficiaries.

## ARTICLE VII
### No Personal Liability and Indemnification

**Section 7.01   No Personal Liability: Members; Manager.**

(a)     Except as otherwise provided in the Delaware Act, by Applicable Law, or expressly in this Agreement, no Member will be obligated personally for any debt, obligation, or liability of the Company or other Members, whether arising in contract, tort, or otherwise, solely by reason of being a Member.

(b)     Except as otherwise provided in the Delaware Act, by Applicable Law, or expressly in this Agreement, no Manager or Business Advisor will be obligated personally for any debt, obligation, or liability of the Company, whether arising in contract, tort, or otherwise, solely by reason of being a Manager or Business Advisor.

**Section 7.02   Indemnification.**

(a)     To the fullest extent permitted under the Delaware Act, any Covered Person (as defined in section (c) below) shall be entitled to indemnification and reimbursement of expenses from the Company for and against any loss, damage, claim, or expense (including reasonable attorneys' fees) (collectively, **"Losses"**) whatsoever incurred by the Covered Person relating to or arising out of any act or omission or alleged acts or omissions (whether or not constituting negligence) performed or omitted by any Covered Person on behalf of the Company; provided, however, that (i) any indemnity under this Section 7.02 shall be provided out of and to the extent of the Company assets only, and neither any Member or any other Person shall have any personal liability to contribute to such indemnity by the Company; (ii) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful; and (iii) such Covered Person's conduct did not constitute fraud or willful misconduct.

(b)     Upon receipt by the Company of a written undertaking by or on behalf of the Covered Person to repay such amounts if it is finally judicially determined that the Covered Person is not entitled to indemnification under this Section 7.02, the Company shall advance, to the extent reasonably required, each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend, or defending any claim, lawsuit, or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 7.02.

DocuSign Envelope ID: 4B2AA6C8-1358-46E5-99C2-0B8C836AF5D6

(c)    For purposes of this Section 7.02, "**Covered Person**" means (i) each Member; (ii) each Manager and Officer of the Company; and (iii) each officer, director, shareholder, partner, manager, member, Affiliate, employee, agent, or representative of each Member and of each Manager.

## ARTICLE VIII
## Accounting and Tax Matters

**Section 8.01   Inspection Rights.** Upon reasonable notice from a Member, the Company shall afford the Member access during normal business hours to the corporate, financial, and similar records, reports, and documents of the Company, and shall permit the Member to examine such documents and make copies thereof.

**Section 8.02   Income Tax Status.** It is the intent of this Company and the Members that this Company shall be treated as a partnership for US, federal, state, and local income tax purposes. Neither the Manager nor any Member shall make an election for the Company to be classified as other than a partnership pursuant to Treasury Regulations Section 301.7701-3.

**Section 8.03   Tax Matters Representative.**

(a)    Appointment; Resignation. The Members hereby appoint the Manager as the "partnership representative" as provided in Section 6223(a) of the Code (the "**Tax Matters Representative**"). The Tax Matters Representative can be removed at any time by a vote of Members holding a majority of the Membership Interests of the Company, and shall resign if it is no longer a Member. In the event of the resignation or removal of the Tax Matters Representative, the holders of a majority of the Membership Interests of the Company shall appoint a new Tax Matters Representative.

(b)    Tax Examinations and Audits. The Tax Matters Representative is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by any federal, state, local, or foreign taxing authority, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.

The Tax Matters Representative shall promptly notify the Members in writing of the commencement of any tax audit, upon receipt of a tax assessment or upon the receipt of a notice of final partnership adjustment, and shall keep the Members reasonably informed of the status of any tax audit and resulting administrative and judicial proceedings. Without the consent of Members holding a majority of the Membership Interests of the Company, the Tax Matters Representative shall not extend the statute of limitations, file a request for administrative adjustment, file suit relating to any Company tax refund or deficiency, or enter into any settlement agreement relating to items of income, gain, loss, or deduction of the Company with any federal, state, local, or foreign taxing authority.

(c)    US Federal Tax Proceedings. To the extent permitted by applicable law and regulations, the Tax Matters Representative will cause the Company to annually elect out

of the partnership audit procedures set forth in Subchapter C of Chapter 63 of the Code as amended by the Bipartisan Budget Act of 2015 (the "**Revised Partnership Audit Rules**") pursuant to Section 6221(b) of the Code. For any year in which applicable law and regulations do not permit the Company to elect out of the Revised Partnership Audit Rules, then within forty-five (45) days of any notice of final partnership adjustment, the Tax Matters Representative will cause the Company to elect the alternative procedure under Section 6226 of the Code, and furnish to the Internal Revenue Service and each Member (including former Members) during the year or years to which the notice of final partnership adjustment relates a statement of the Member's share of any adjustment set forth in the notice of final partnership adjustment.

(d)     Section 754 Election. The Tax Matters Representative will make an election under Section 754 of the Code, if requested in writing by Members holding a majority of the outstanding Membership Interests.

(e)     Indemnification. The Company shall defend, indemnify, and hold harmless the Tax Matters Representative against any and all liabilities sustained as a result of any act or decision concerning Company tax matters and within the scope of such Member's responsibilities as Tax Matters Representative, so long as such act or decision was done or made in good faith and does not constitute gross negligence or willful misconduct.

**Section 8.04    Tax Returns.**

(a)     At the expense of the Company, the Manager will cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required tax returns in each jurisdiction in which the Company owns property or does business. As soon as reasonably possible after the end of each Fiscal Year, the Manager will deliver to each Member, Company information necessary for the preparation of such Member's federal, state, and local income tax returns for such Fiscal Year.

(b)     Each Member agrees that such Member shall not treat any Company item on such Member's federal, state, foreign, or other income tax return inconsistently with the treatment of the item on the Company's return.

**ARTICLE IX**
**Sale Rights**

**Section 9.01    Drag-Along Rights.**

(a)     Participation. If at any time, a Member (together with its Affiliates) who holds more than 50% of the Membership Interests of the Company (the "**Dragging Member**"), receives a bona fide offer from an Independent Third Party to consummate, in one transaction or a series of related transactions, a Change of Control (a "**Drag-Along Sale**"), the Dragging Member shall have the right to require that each other Member (each, a "**Drag-Along Member**") participates in such sale in the manner set forth in this Section 9.01.

(b)    Sale Notice. The Dragging Member shall exercise its rights pursuant to this Section 9.01 by delivering a written notice (the "**Drag-Along Notice**") to the Company and each Drag-Along Member no more than 10 days after the execution and delivery by all of the parties thereto of the definitive agreement entered into with respect to the Drag-Along Sale and, in any event, no later than 20 days prior to the closing date of such Drag-Along Sale. The Drag-Along Notice shall make reference to the Dragging Member's rights and obligations hereunder and shall describe in reasonable detail:

(i)    the name of the person or entity to whom such Membership Interests are proposed to be sold;

(ii)    the proposed date, time, and location of the closing of the sale;

(iii)    the percentage of Membership Interests to be sold by the Dragging Member, the proposed amount of consideration for the Drag-Along Sale, and the other material terms and conditions of the Drag-Along Sale; and

(iv)    a copy of any form of agreement proposed to be executed in connection therewith.

(c)    Membership Interests to be Sold. Subject to Section 9.01(d):

(i)    if the Drag-Along Sale is structured as a sale resulting in more than 50% of the Membership Interests of the Company being held by an Independent Third Party, each Drag-Along Member shall sell in the Drag-Along Sale the percentage of Membership Interests equal to the product obtained by multiplying (A) the percentage of Membership Interests held by such Drag-Along Member by (B) a fraction (1) the numerator of which is equal to the percentage of Membership Interests the Dragging Member proposes to sell or transfer in the Drag-Along Sale and (2) the denominator of which is equal to the percentage of Membership Interests held by the Dragging Member at such time.

(ii)    if the Drag-Along Sale is structured as a sale of all or substantially all of the assets of the Company or as a merger, consolidation, recapitalization, or reorganization of the Company, then notwithstanding anything to the contrary in this Agreement (including Section 3.02), each Drag-Along Member shall vote in favor of the transaction and otherwise consent to and raise no objection to such transaction.

(d)    Conditions of Sale. The consideration to be received by a Drag-Along Member shall be the same form and amount of consideration per Membership Interest percentage to be received by the Dragging Member (or, if the Dragging Member is given an option as to the form and amount of consideration to be received, the same option shall be given) and the terms and conditions of such sale shall, except as otherwise provided in the immediately succeeding sentence, be the same as those upon which the Dragging Member sells its Membership Interests. Each Drag-Along Member shall make or provide the same representations, warranties, covenants, indemnities, and agreements as the Dragging Member makes or provides in connection with the Drag-Along Sale (except

DocuSign Envelope ID: 4B2AA6C8-1358-46E5-99C2-0B8C836AF5D6

that in the case of representations, warranties, covenants, indemnities, and agreements pertaining specifically to the Dragging Member, the Drag-Along Member shall make the comparable representations, warranties, covenants, indemnities, and agreements pertaining specifically to itself); provided, that all representations, warranties, covenants, and indemnities shall be made by the Dragging Member and each Drag-Along Member severally and not jointly and any indemnification obligation shall be pro rata based on the consideration received by the Dragging Member and each Drag-Along Member (other than any indemnification obligation pertaining specifically to the Dragging Member or a Drag-Along Member, which obligation shall be the sole obligation of such Dragging Member or Drag-Along Member), in each case in an amount not to exceed the aggregate proceeds received by the Dragging Member and each such Drag-along Member in connection with the Drag-Along Sale.

(e)    Expenses. The fees and expenses of the Dragging Member incurred in connection with a Drag-Along Sale and for the benefit of all Members (it being understood that costs incurred by or on behalf of a Dragging Member for its sole benefit will not be considered to be for the benefit of all Members), to the extent not paid or reimbursed by the Company or the Independent Third Party, shall be shared by all the Members on a pro rata basis, based on the consideration received by each Member; *provided*, that no Member shall be obligated to make any out-of-pocket expenditure prior to the consummation of the Drag-Along Sale.

(f)    Cooperation. Each Member shall take all actions as may be reasonably necessary to consummate the Drag-Along Sale, including, without limitation, entering into agreements and delivering certificates and instruments, in each case, consistent with the agreements being entered into and the certificates being delivered by the Dragging Member.

(g)    Consummation of the Sale. The Dragging Member shall have 90 days following the date of the Drag-Along Notice in which to consummate the Drag-Along Sale, on the terms set forth in the Drag-Along Notice (which such 90 day period may be extended for a reasonable time not to exceed 120 days to the extent reasonably necessary to obtain any regulatory approvals). If at the end of such period the Dragging Member has not completed the Drag-Along Sale, the Dragging Member may not then effect a transaction subject to this Section 9.01 without again fully complying with the provisions of this Section 9.01.

**Section 9.02    Tag-Along Rights.**

(a)    Participation. Subject to the terms and conditions specified in Article VI, if at any time, a Member who (together with its Affiliates) holds no less than 51% of the outstanding Membership Interests of the Company (the "**Selling Member**") proposes to sell any Membership Interests to an Independent Third Party (the "**Proposed Transferee**") and the Selling Member cannot or has not elected to exercise its drag-along rights set forth in Section 9.01, each other Member (each, a "**Tag-Along Member**") shall be permitted to participate in such sale (a "Tag-Along Sale") on the terms and conditions set forth in this Section 9.02.

129057949v7

(b)    Sale Notice. Prior to the consummation of a Tag-Along Sale, the Selling Member shall deliver to the Company and each Tag-Along Member a written notice (a "**Sale Notice**") of the proposed Tag-Along Sale subject to this Section 9.02 no more than 10 days after the execution and delivery by all the parties thereto of the definitive agreement entered into with respect to the Tag-Along Sale and, in any event, no later than 20 days prior to the closing date of the Tag-Along Sale. The Sale Notice shall make reference to the Tag-Along Members' rights hereunder and shall describe in reasonable detail:

(i)    the percentage of Membership Interests to be sold by the Selling Member;

(ii)    the name of the Proposed Transferee;

(iii)    the purchase price and the other material terms and conditions of the sale, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof;

(iv)    the proposed date, time, and location of the closing of the sale; and

(v)    a copy of any form of agreement proposed to be executed in connection therewith.

(c)    Amount to be Sold.

(i)    Each Tag-Along Member shall exercise its right to participate in a sale of Membership Interests by the Selling Member subject to this Section 9.02 by delivering to the Selling Member a written notice (a "**Tag-Along Notice**") stating its election to do so (each Tag-Along Member electing to do so, a "**Participating Tag-Along Member**") and specifying the percentage of Membership Interests to be sold by it no later than five days after receipt of the Sale Notice (the "**Tag-Along Period**"). The offer of each Participating Tag-Along Member set forth in a Tag-Along Notice shall be irrevocable, and, to the extent such offer is accepted, such Participating Tag-Along Member shall be bound and obligated to sell in the proposed sale on the terms and conditions set forth in this Section 9.02. Each Tag-Along Member shall have the right to sell in a sale subject to this Section 9.02 the percentage of Membership Interests equal to the product obtained by multiplying (A) the percentage of Membership Interests held by the Tag-Along Member by (B) a fraction (1) the numerator of which is equal to the percentage of Membership Interests the Selling Member proposes to sell or transfer to the Proposed Transferee and (2) the denominator of which is equal to the percentage of Membership Interests then owned by such Selling Member.

(ii)    the Selling Member shall use its commercially reasonable efforts to include in the proposed sale to the Proposed Transferee all of the Membership Interests that the Tag-Along Members have requested to have included pursuant to the applicable Tag-Along Notices, it being understood that the Proposed Transferee shall not be required to purchase Membership Interests in excess of the amount set

forth in the Sale Notice. In the event the Proposed Transferee elects to purchase less than all of the Membership Interests sought to be sold by the Participating Tag-Along Members, the percentage of Membership Interests to be sold to the Proposed Transferee by the Selling Member and each Participating Tag-Along Member shall be reduced so that each such Member is entitled to sell its pro rata portion of the percentage of Membership Interests the Proposed Transferee elects to purchase (which in no event may be less than the percentage of Membership Interests set forth in the Sale Notice).

(iii)    Each Tag-Along Member who does not deliver a Tag-Along Notice in compliance with Section 9.02(c)(i) shall be deemed to have waived all of such Tag-Along Member's rights to participate in such Tag-Along Sale, and the Selling Member shall (subject to the rights of any Participating Tag-Along Member) thereafter be free to sell to the Proposed Transferee its Membership Interests at a per Membership Interest percentage price that is no greater than the per Membership Interest percentage price set forth in the Sale Notice and on other terms and conditions which are not in the aggregate materially more favorable to the Selling Member than those set forth in the Sale Notice, without any further obligation to the Tag-Along Members that are not Participating Tag-Along Members.

(d)    Consideration. The Selling Member and each Participating Tag-Along Member shall receive the same consideration per Membership Interest percentage after deduction of such Member's proportionate share of the related expenses in accordance with Section 9.02(f).

(e)    Conditions of Sale. Each Participating Tag-Along Member shall make or provide the same representations, warranties, covenants, indemnities, and agreements as the Selling Member makes or provides in connection with the Tag-Along Sale (except that in the case of representations, warranties, covenants, indemnities, and agreements pertaining specifically to the Selling Member, the Participating Tag-Along Member shall make the comparable representations, warranties, covenants, indemnities, and agreements pertaining specifically to itself); *provided*, that all representations, warranties, covenants, and indemnities shall be made by the Selling Member and each Participating Tag-Along Member severally and not jointly and any indemnification obligation in respect of breaches of representations and warranties that do not relate to such Tag-Along Member shall be in an amount not to exceed the aggregate proceeds received by such Tag-Along Member in connection with any sale consummated pursuant to this Section 9.02.

(f)    Expenses. The fees and expenses of the Selling Member incurred in connection with a sale under this Section 9.02 and for the benefit the Selling Member and all Participating Tag-Along Members (it being understood that costs incurred by or on behalf of the Selling Member for its sole benefit will not be considered to be for the benefit of all Participating Tag-Along Members), to the extent not paid or reimbursed by the Company or the Proposed Transferee, shall be shared by the Selling Member and all the Participating Tag-Along Members on a pro rata basis, based on the consideration received by each such Member; *provided*, that no such Participating Tag-Along Member shall be

obligated to make any out-of-pocket expenditure prior to the consummation of the transaction consummated pursuant to this Section 9.02.

(g)    Cooperation. The Selling Member and each Participating Tag-Along Member shall take all actions as may be reasonably necessary to consummate the Tag-Along Sale, including, without limitation, entering into agreements and delivering certificates and instruments, in each case, consistent with the agreements being entered into and the certificates being delivered by the Selling Member.

(h)    Deadline for Completion of Sale. The Selling Member shall have 90 days following the expiration of the Tag-Along Period in which to sell the Membership Interests described in the Sale Notice, on terms not more favorable to the Selling Member than those set forth in the Sale Notice (which such 90 day period may be extended for a reasonable time not to exceed 120 days to the extent reasonably necessary to obtain any regulatory approvals). If at the end of such period the Selling Member has not completed such sale, the Selling Member may not then effect a sale of Membership Interests subject to this Section 9.02 without again fully complying with the provisions of this Section 9.02.

(i)    Sales in Violation of the Tag-Along Right. If the Selling Member sells or otherwise transfers to the Proposed Transferee any of its Membership Interests in breach of this Section 9.02, then each Tag-Along Member shall have the right to sell to the Selling Member, and the Selling Member undertakes to purchase from each Participating Tag-Along Member, the percentage of Membership Interests that such Tag-Along Member would have had the right to sell to the Proposed Transferee pursuant to this Section 9.02, for a per Membership Interest percentage amount and form of consideration and upon the term and conditions on which the Proposed Transferee bought such Membership Interests from the Selling Member, but without indemnity being granted by any Tag-Along Member to the Selling Member; *provided*, that nothing contained in this Section 9.02 shall preclude any Member from seeking alternative remedies against such Selling Member as a result of its breach of this Section 9.02. The Selling Member shall also reimburse each Participating Tag-Along Member for any and all reasonable and documented out-of-pocket fees and expenses, including reasonable legal fees and expenses, incurred pursuant to the exercise or the attempted exercise of the Tag-Along Member's rights under this Section 9.02(i).

## ARTICLE X
### Dissolution and Liquidation

**Section 10.01 Events of Dissolution.** The Company shall be dissolved and its affairs wound up only upon the occurrence of any of the following events:

(a)    An election to dissolve the Company made by holders of a majority of the Membership Interests;

(b)    The sale, exchange, involuntary conversion, or other disposition or Transfer of all or substantially all the assets of the Company; or

DocuSign Envelope ID: 4B2AA6C8-1358-46E5-99C2-0B8C836AF5D6

(c)    The entry of a decree of judicial dissolution under § 18-802 of the Delaware Act.

**Section 10.02  Effectiveness of Dissolution.** Dissolution of the Company shall be effective on the day on which the event described in Section 10.01 occurs, but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in Section 10.03, and the Certificate of Formation shall have been cancelled as provided in Section 10.04.

**Section 10.03  Liquidation.** If the Company is dissolved pursuant to Section 10.01, the Company shall be liquidated and its business and affairs wound up in accordance with the Delaware Act and the following provisions:

(a)    The Manager, or another Person selected by the Manager, shall act as liquidator to wind up the Company (the "**Liquidator**"). The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b)    As promptly as possible after dissolution and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(c)    The Liquidator shall liquidate the assets of the Company and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

(i)    First, to the payment of the Company's debts and liabilities to its creditors (including Members, if applicable) and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii)    Second, to the establishment of and additions to reserves that are determined by the Manager to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

(iii)    Third, to the Members, on a pro rata basis, in accordance with the positive balances in their respective Capital Accounts, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the Company occurs.

**Section 10.04  Required Filings.** Upon completion of the winding up of the Company, the Liquidator shall make all necessary filings required by the Delaware Act.

**ARTICLE XI**
**Definitions**

**Section 11.01 Definitions.** Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this Section 11.01:

(a)      "**Affiliate**" means, with respect to any Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person. For purposes of this definition, "**control**" when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract, or otherwise; and the terms "**controlling**" and "**controlled**" shall have correlative meanings.

(b)      "**Applicable Law**" means all applicable provisions of (i) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations, or orders of any Governmental Authority; (ii) any consents or approvals of any Governmental Authority; and (iii) any orders, decisions, advisory, or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

(c)      "**Business Advisor**" means Ray Kvalvog or Ben Woodside as long as they are Members of the Company.

(d)      "**Certificate of Formation**" means the certificate of formation filed with the Delaware Secretary of State on September 14, 2023.

(e)      "**Change of Control**" (i) means the sale of all or substantially all of the assets of the Company to an Independent Third Party; (ii) a sale resulting in more than 50% of the Membership Interests of the Company being held by an Independent Third Party; or (iii) a merger, consolidation, recapitalization, or reorganization of the Company with or into an Independent Third Party.

(f)      "**Code**" means the Internal Revenue Code of 1986, as amended.

(g)      "**Control**," including the terms "controlled by" and "under common control with," means the power to direct the affairs of a Person by reason of ownership of voting securities, by contract, or otherwise.

(h)      "**Delaware Act**" means the Delaware Limited Liability Company Act and any successor statute, as it may be amended from time to time.

(i)      "**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved, and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

(j)      "**Equity Securities**" means any and all Membership Interests of the Company and any securities of the Company convertible into, exchangeable for, or

129057949v7

DocuSign Envelope ID: 4B2AA6C8-1358-46E5-99C2-0B8C836AF5D6

exercisable for, such Membership Interests, including, without limitation, any warrants or other rights to acquire such Membership Interests.

(k)    **"Fiscal Year"** means the calendar year, unless the Company is required or elects to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to its taxable year.

(l)    **"Governmental Authority"** means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations, or orders of such organization or authority have the force of law), or any arbitrator, court, or tribunal of competent jurisdiction.

(m)    **"Independent Third Party"** means, with respect to any Member, any Person who is not an Affiliate of such Member.

(n)    **"Lien"** means any mortgage, pledge, security interest, option, right of first offer, encumbrance, or other restriction or limitation of any nature whatsoever.

(o)    **"Manager"** means, initially, David Nelson, or such other Member as may be designated or become the Manager pursuant to the terms of this Agreement.

(p)    **"Marital Relationship"** means a civil union, domestic partnership, marriage, or any other similar relationship that is legally recognized in any jurisdiction.

(q)    **"Membership Interest"** means an interest in the Company owned by a Member, including such Member's rights to (i) receive a distributive share of Company assets and items of Company income, gain, loss, and deduction; (ii) vote, consent, or participate in any Member decisions provided in this Agreement and the Delaware Act; and (iii) receive any and all other benefits due to a Member under this Agreement and the Delaware Act. The Membership Interest of each Member will be stated as a percentage interest in the same proportion as the total Capital Contributions of such Member bears to the total Capital Contributions of all Members.

(r)    **"Person"** means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

(s)    **"Securities Act"** means the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations thereunder, which shall be in effect at the time.

(t)    **"Spouse"** means a spouse, a party to a civil union, a domestic partner, a same-sex spouse or partner, or any individual in a Marital Relationship with a Member.

(u)    **"Transfer"** means to sell, transfer, assign, gift, pledge, encumber, hypothecate, or similarly dispose of, directly or indirectly, voluntarily or involuntarily, by

DocuSign Envelope ID: 4B2AA6C8-1358-46E5-99C2-0B8C836AF5D6

operation of law or otherwise, or to enter into any contract, option, or other arrangement or understanding with respect to the sale, transfer, assignment, gift, pledge, encumbrance, hypothecation, or similar disposition of, any Membership Interests or any interest (including a beneficial interest) therein. "**Transfer**" when used as a noun shall have a correlative meaning.

(v)    "**Transferor**" and "**Transferee**" mean a Person who makes or receives a Transfer, respectively.

## ARTICLE XII
### Miscellaneous

**Section 12.01 Governing Law.** This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any jurisdiction).

**Section 12.02 Submission to Jurisdiction.** The parties hereby agree that any suit, action, or proceeding based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, shall be brought in the federal courts of the United States of America or the courts of the State of Delaware, in each case located in the City of Minneapolis and County of Hennepin. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action, or proceeding.

**Section 12.03 <u>Waiver of Jury Trial</u>. EACH PARTY HERETO HEREBY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

**Section 12.04 Waiver.** No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power, or privilege preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege. Nothing contained in this Section 11.04 shall diminish the waiver described in Section 12.03.

**Section 12.05 Notices.** All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given:

(a)    when delivered by hand;

(b)    · when received by the addressee if sent by a nationally recognized overnight courier;

DocuSign Envelope ID: 4B2AA6C8-1358-46E5-99C2-0B8C836AF5D6

(c)    on the date sent by facsimile or email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or

(d)    on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.

Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 11.05):

| If to the Company: | 4043 Sheridan Avenue South Minneapolis, MN 55410 Email: dnelson@rahrahsolutions.com Attention: Manager |
|---|---|
| with a copy to: | Taft Stettinius & Hollister LLP 2200 IDS Center 80 South Eighth Street Minneapolis, MN 55402 Email: keick@taftlaw.com Attention: Kathleen Eick |
| If to the Manager: | 4043 Sheridan Avenue South Minneapolis, MN 55410 Email: dnelson@rahrahsolutions.com Attention: David Nelson |
| with a copy to: | Taft Stattinius & Hollister LLP 2200 IDS Center 80 South Eighth Street Minneapolis, MN 55402 Email: keick@taftlaw.com Attention: Kathleen Eick |
| If to a Member: | To the Member's respective mailing address as set forth on the Members Schedule. |

**Section 12.06 Remedies.** In the event of any actual or prospective breach or default by any party, the other parties shall be entitled to equitable relief, including remedies in the nature of injunction and specific performance, awarded by a court of competent jurisdiction (without being required to post a bond or other security or to establish any actual damages). In this regard, the

129057949v7

parties acknowledge and agree that they will be irreparably damaged in the event this Agreement is not specifically enforced, since (among other things) the Membership Interests are not readily marketable. All remedies hereunder are cumulative and not exclusive, may be exercised concurrently, and nothing herein shall be deemed to prohibit or limit any party from pursuing any other remedy or relief available at law or in equity for any actual or prospective breach or default, including recovery of damages. In addition, the parties hereby waive and renounce any defense to such equitable relief that an adequate remedy at law may exist.

**Section 12.07 Severability.** If any term or provision of this Agreement is held to be invalid, illegal, or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

**Section 12.08 Successors and Assigns.** Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, and assigns.

**Section 12.09 Amendment.** No provision of this Agreement may be amended or modified except by an instrument in writing executed by Members holding a majority of the Membership Interests. Any such written amendment or modification will be binding upon the Company and each Member. Notwithstanding the foregoing, amendments to the Members Schedule may be made by the Manager in accordance with Section 3.02(a).

**Section 12.10 Headings.** The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision of this Agreement.

**Section 12.11 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.

**Section 12.12 Entire Agreement.** This Agreement, together with the Certificate of Formation and all related Exhibits and Schedules, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

**Section 12.13 No Third-Party Beneficiaries.** Except as provided in ARTICLE VII, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, legal representatives, successors, and permitted assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

*[Signature Pages Follow]*

129057949v7

DocuSign Envelope ID: 4B2AA6C8-1358-46E5-99C2-0B8C836AF5D6

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**The Company:**

RAHRAH SOLUTIONS, LLC, a Delaware limited liability company

_____

David Nelson
Manager

**The Members:**

_____

David Nelson

_____

Anders Haugen

_____

Jeremy Lipinski

_____

Robert Bonine

129057949v7

DocuSign Envelope ID: 4B2AA6C8-1358-46E5-99C2-0B8C836AF5D6

DocuSigned by:

*Ben Woodside*

Ben Woodside

_____

Ray Kvalvog

WHITE RABBIT TRUST

By: _____

Name: _____

Title: _____

129057949v7

DocuSign Envelope ID: 4B2AA6C8-1358-46E5-99C2-0B8C836AF5D6

## SCHEDULE I

### MEMBERS SCHEDULE

| Member Name, Address, Email, and Fax | Capital Contribution | Membership Interest |
|---|---|---|
| David Nelson<br>4043 Sheridan Avenue South<br>Minneapolis, MN 55410<br>dnelson@rahrahsolutions.com | $3,000,000 | 71.43% |
| Jeremy Lipinski<br>406 Meadow Valley Trail<br>Hudson, WI 54016<br>jlipinski@llwadvisors.com | $50,000 | 1.19% |
| Anders Haugen<br>4732 Perry Avenue North<br>Crystal, MN 55429<br>ahaugen@llwadvisors.com | $50,000 | 1.19% |
| Robert Bonine<br>3274 Katie Lane<br>Arden Hills, MN 55112<br>rbonine@llwadvisors.com | $50,000 | 1.19% |
| White Rabbit Trust<br>c/o Kelly J. Lipp<br>25652 North Desoto Lane<br>Rio Verde, AZ 85263<br>kellyjlipp@yahoo.com | $50,000 | 1.19% |
| Ben Woodside<br>4266 38th Avenue S<br>Fargo, ND 58104<br>bmwoodside@gmail.com | $500,000 | 11.9%% |
| Ray Kvalvog<br>323 48th Avenue SW<br>Moorhead, MN 56529<br>2hotelboys@gmail.com | $500,000 | 11.9% |

129057949v7

# Exhibit H

1/28/25, 10:34 AM                                          Gmail - Re: FEE AGREEMENT

 **Gmail**

Ben Woodside <bmwoodside@gmail.com>

---

## Re: FEE AGREEMENT
2 messages

**Brady Lipp** <blipp@gpcchi.com>                                    Fri, Nov 17, 2023 at 11:10 AM
To: David Nelson <dnelson@rahrahsolutions.com>
Cc: Joseph Ransdell <jransdell@gpcchi.com>, "bmwoodside@gmail.com" <bmwoodside@gmail.com>

David,

Thank you for communicating and sharing your thoughts with us. Let me share another viewpoint with you
that reflects the truth about our relationship. Ben, I wanted to include you in this communication so you
are in the loop on what's really going on.

The Fee Agreement that you signed September 5th, 2023 was three pages long and needs to be read in its
entirety. There was a fixed fee of $15,000 to help cover due diligence, legal, escrow account, and other
fixed costs associated with the project and that was explained to you very clearly on the front end. We
generally refer to this fee internally as a retainer fee as we normally require this fee to be paid upfront
before we get started. I asked Great Point Capital to defer this fee until we had the money raised in the
escrow account since money was tight for RahRah when we got started. The success fee is not only
appropriate, but it's standard in this industry as it is paid only upon success of the transactions. In fact, I
recently helped a publicly traded company called Cloud dx raise $1 million it needed quickly at the same fee
schedule we did for RahRah, which was a $15,000 retainer fee plus the 8% incentive fee, plus 8% warrant
coverage. If you and/or Ben want to talk to Cloud dx's CEO Robert Kaul as a reference, I can tee up a call
with him. The lower fee schedule which you referred to in your prior email had been sent to you by Joe
Ransdell and hasn't been signed by you. The 9% incentive fee dropped to 8% and the warrant coverage
dropped from 8% to 3%. The warrant coverage means that I would have the option to buy $60,000 worth of
RahRah equity at the same valuation as the rest of the investors. It's important to note that I would have to
buy the stock from RahRah just like the other investors. It isn't given to me.

David, you and I were introduced to each other by John Griffin, an individual that has become your right-
hand man responsible for signing up high schools and youth groups in the Twin Cities for RahRah! The
reason he introduced us is because you were frustrated by your inability to raise capital during the prior
three years and he knew I could help you. You specifically asked me to help you raise $2 million. After
spending two days with you, I was impressed by you and your business idea, and explained my situation of
having a securities license held by Great Point Capital. That required me to get permission from Great Point
Capital to raise money for you because I am not legally able to raise money for any business or even be
involved in the business activity of another company without their knowledge and approval. I sought
approval and received it with the understanding that I would assume the responsibility for raising all the
money myself without the help of other advisors at Great Point Capital. It is important to note that Great
Point Capital has an excellent distribution network that could come in handy if RahRah has additional
funding needs going forward, which I believe will be the case.

You and I talked extensively about the terms and expectations of a relationship between RahRah! and Great
Point Capital. You agreed to those terms orally and in writing as shown in the agreement dated September
5th, 2023. It was a no-risk deal for you because you weren't out anything if the deal failed. Our sole
objective was to get $2 million in the bank account for RahRah! by year-end, preferably from investors that
we thought could be strategic to RahRah! That required patience and strategic thought and lots of time and

hard work on the part of you and me. As a team, we appear to have achieved that objective if what you are reporting to John Griffin and me is true.

In addition to introducing you to high quality angel investors you otherwise would not have met, 1.) I have given you guidance and advice on improving your presentation material, 2.) given you feedback on making better presentations to investors (choice of words, proper dresscode, 3.) done competitor analysis, 4.) helped you with financial projections and assumptions 5.) assisted you with proper valuation in the current market, 6.) assisting you in assessing term sheets and choosing investors, and 7.) helping you better position the company in the marketplace. We have spent a ton of time together over the past almost nine months. All this was done to increase our probability of success.

Hundreds of calls and meetings have been done with dozens of prospective investors since early March to get us to where we are today. Early on we did calls with sophisticated angel investors like Don Schultheis, Larry Johnson, Dr. David Hunnicutt and other contacts of mine to help us get a beat on how best to position and price RahRah. Shortly thereafter came additional investors like Nick Storm and others which provided additional feedback that led to you agreeing to bring on a more seasoned CEO at the right time to run the business on a day to day so you can focus on sales and managing a salesforce. We repriced direct donations all the way down to taking just 5% which made our product more attractive. We also stopped positioning the company as a social media company, became more focused in our immediate future of selling memberships, and not dwelling on the college NIL opportunities at the expense of our core business in the youth groups and high schools.

During the course of our almost 9-month relationship, I have given you plenty of freedom with some of my best prospects including Nick Storm and Ben Woodside. I haven't tried to control those relationships and force you to always go through me to communicate with them because I wanted the fund-raising process to be as quick and seamless as possible. We agreed early on this was going to be a team effort. As the current CEO it is your most important responsibility to close investors that I position and tee up for you. I trusted you and had confidence in you to effectively communicate the risks of the investment, the opportunity for investors, and to effectively communicate my contributions and current role with the firm which was primarily to do everything needed to complete a successful capital raise to get RahRah's growth trajectory started without worrying about who was going to claim credit. For almost nine months, I have provided you with great prospects and teed them up beautifully for you. With that freedom I have given you with my relationships comes responsibility to effectively communicate each parties' contributions and value so their is an appreciation for each other's role even if you choose to meet with my leads on your own.

The one binding commonality for Ben, you, and myself is that we are all hoopsters, we all played on championship teams. Ben and I were captains of championship teams at NDSU, and I can't speak for Ben's teams, but with our team we had spats and fights, much like a family does. Broken noses, knocked out front teeth, arguments were part of the protocol, but when it was game time, we came together as one and kicked ass. I am going to treat this as such a spat. There is too much opportunity ahead for any one person to claim credit for everything. When Winkelman was nailing down a three pointer after a perfect pass chest high from Woody, I am guessing he acknowledged a great assist. Let's get our shit together and act like champions.

Let's break down the current situation, the three primary parties, and how each party has benefited from the others contributions and a successful $2 million raise . The three parties involved are as follows:

1. David Nelson
2. Ben Woodside and Ray
3. Great Point Capital

**David Nelson** would have never met Ben had I not made multiple calls to Ben to get a lunch meeting scheduled in Fargo. It was my responsibility to get David in front of good strategic investors, and I did that when I made this introduction. A successful $2 million raise provides the capital for David to get a **$200,000 base salary** plus the opportunity for a sizeable bonus over time as revenue at RahRah develops. In addition, **David's net worth increases by $3 million** on paper as a 60% owner of a $5 million company.

**Ben Woodside** would have never met David or heard about RahRah if I hadn't convinced him to meet us for lunch in Fargo. I had positioned the opportunity as something that was right up Ben's wheelhouse given his connections in ND, love of sports, his competitive zeal, and his work ethic. In addition, I suggested that David give Ben the entire state of North Dakota to develop as a territory for free with no licensing fee and an attractive revenue split if he would help us raise $500,000 in investment capital in the Fargo area. The gross revenue for RahRah in ND over time is expected to be at least $3 million within a few years. Ben's 35% revenue share will result in over $1 million in revenue per year and an expected net profit of between **$400,000 and $500,000 per year** after paying for the salespeople expenses. This means that Ben is actually getting paid for investing in RahRah! I couldn't have structured a better deal for anyone. The other thing Ben needs to realize, is that when I met David he wanted an $8 million pre-raise valuation of RahRah. Ben, you're now paying a $3 million valuation because of this lengthy and tedious price discovery process and negotiation I have gone through with David. That means the $1 million you and Ray are investing is now going to buy 25% of the company instead of 11% of the company. To make the illustration simple, that means if there was no additional money raised, and the valuation of RahRah was to balloon to $100 million, that $1 million would go to $25 million instead of $11 million if you had paid the higher $ 8 million valuation to begin with.

**Great Point Capital** would receive roughly $80,000 in total incentive fees plus the $15,000 retainer to be split between Brady, Joe Ransdell, expenses, and Great Point Capital for the first $1 million raised. And this is a one-time fee. Great Point would receive and additional $64,000 when the last $800,000 is raised. Any investment professional would pay somebody a few hundred thousand dollars if it increased their net worth multi-millions of dollars. I have added incredible value for both of you and I shouldn't have to point that out.

When you look at the benefits that accrue to both David and Ben as a result of the role Great Point Capital played in being a part of a successful $1 million to $2 million equity raise when zero money was raised in the three years prior to Great Point Capital's involvement, you will understand why it is hard for us to fathom why we are even having this conversation.

For all the reasons listed above along with the absence of any communication from you or Ben this week, the fees listed in the new agreement, which you haven't signed are non-negotiable. If you want to ride with the existing higher fee schedule that has already been signed, that is acceptable to us as well.

Since the original introductory meeting I lined up for you and Ben, I have been excluded from your subsequent meetings with him. If I am going to be excluded from meetings with prospects, the responsibility lies with you as CEO to adequately communicate with them about any questions or concerns they have about anything including risks, roles and fees. Ben seems confused which leads me to believe that something needs to be addressed and more adequately explained in order to make him feel more comfortable.  I am always here to support you and our contacts in any way possible.  We are all working towards a common goal. If you and Ben want to talk this week, please let us know. I have been looking forward to the day when we are fully funded with all the $2 million so we can get to work on building RahRah together instead of being consumed with raising capital. I am completely perplexed at your radio silence this week and your insistence on needing a lawyer to speak with us. There is still a big job ahead for all of us, if you want me to be a part of the future for RahRah. And I would like to be a part of RahRah going

forward as I believe I can add great value at the University of Minnesota, strategic direction, great contacts for future raises, assisting in opening new territories amongst a host of other value adds.

I would suggest you, Ben, and me get together face to face in Fargo or the Twin Cities next week to discuss game plan for the next few months and to address any existing concerns.

---

**From:** David Nelson <dnelson@rahrahsolutions.com>
**Sent:** Thursday, November 16, 2023 11:21 AM
**To:** Joseph Ransdell <jransdell@gpcchi.com>; Brady Lipp <blipp@gpcchi.com>
**Subject:** FEE AGREEMENT

Brady and Joe,

I have received various calls and emails from both of you in response to my questions and reaction to your proposed fee agreement. I assumed the inclusion of the second compensation section was an oversight based on the finder services (and nothing else) that Great Point provided. If you meant to include it, then it appears it was buried in a different part of the document.

We had agreed to decrease the fees and I had been asking for your new proposed fee agreement for some time. I don't appreciate that you waited until after I had secured the transaction on my own to suddenly send me your proposed agreement.

The bottom line is that Great Point made two introductions for me and those were the only services provided. On top of that, after I had spent numerous days, hours and conversations with the investors, and solidified investments on my own, the barrage of paperwork from Great Point nearly lost me investments.

Given all that, the only fee that RahRah is willing to pay Great Point under the finder's agreement is the $15,000 finder's fee.

David

*David Nelson*
*Founder + CEO*
*RahRah*
*(612)-867-4088*



1/28/25, 10:34 AM                                    Gmail - Re: FEE AGREEMENT



# RAHRAH

**Because every kid deserves a cheering section!**

**[EXTERNAL]:** *This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.*

---

**Ben Woodside** <bmwoodside@gmail.com>                          Thu, Oct 10, 2024 at 9:16 PM
To: Tom Kading <tom@fargopatentlaw.com>, David Chapman <DChapman@djchapmanlaw.com>

Tom/Dave,

Here is Brady Lipp's email to Dave regarding the broker fee.

Again, Ray and I had ZERO knowledge of any fee associated with our investment and I do not think there is any broker fee on executive summary.

Thanks,
Ben
[Quoted text hidden]